THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ROOSEVELT DANIELS *et al.*, Defendants-Appellants.

First District (5th Division)    No. 77-1452

Opinion filed July 27, 1979.

Ralph Ruebner and Andrew Berman, both of State Appellate Defender's Office, of Chicago, for appellant Curtis Akins.

James J. Doherty, Public Defender, of Chicago (Timothy D. Murphy and Timothy P. O'Neill, Assistant Public Defenders, of counsel), for appellant Ernest Terry.

Ackerman, Durkin and Egan, of Chicago (Allan A. Ackerman and Steven M. Levin, of counsel), for appellant Roosevelt Daniels.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James S. Veldman, and Suzanne Philbrick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendants Ernest Terry and Roosevelt Daniels were convicted of murder and armed robbery. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1 and 18—2.) They were respectively sentenced to terms of 50-100 and 75-150 years for the murder, and to concurrent terms of 10-30 years for the armed robbery. Defendant Curtis Akins was convicted of armed robbery and sentenced to one term of 10-30 years. On appeal, they contend that the trial court erred when it refused to allow the testimony of a previously undisclosed witness, and that they were denied the effective assistance of counsel. Additionally, Akins and Terry contend that they were not convicted beyond a reasonable doubt; Daniels and Terry contend that they were denied a fair trial by the prosecutor's closing argument; and Terry contends that he was improperly arrested, that certain identification procedures were impermissibly suggestive and that his sentence was excessive.

The following pertinent facts were adduced at trial.

*For the State*
*Andrew Williams*

He sold narcotics and used them three or four times a week. On January 10, 1975, at approximately 9 a.m., he went to Curtis Akins' residence at 331 South Bell in Chicago to purchase narcotics. Defendants Daniels and Akins were on the scene when he arrived, and other people,

including defendant Ernest Terry and Michael Coleman arrived shortly thereafter. After Daniels asked Coleman about some money, Daniels told Terry and another man to take Coleman to the back porch. Daniels and the other men went to the porch and closed the door, and Williams heard some "hollering" and "a whole lot of talking." Akins said that he was "going out there to see if he can [sic] get something," and went out to the porch. As Akins opened the door, Williams saw Terry, Daniels and the other man kicking and beating Coleman, who was lying on the floor. Daniels had a board, and one of the other men had a pipe. Although the porch door was closed again, he heard Daniels continue to ask Coleman about money. Akins returned, showed Williams a watch, and said he was going to "see if he could get something else." Akins then went back to the porch. As Akins opened the door, Williams again saw that Coleman was on the floor surrounded by the others, and heard that Daniels was asking about money. He saw that Coleman was moving, but did not hear him say anything. Williams then left the apartment. He first told a police officer what he had seen when he spoke to Officer Tom Kinsella in May of 1975.

On cross-examination, he acknowledged that the porch door was opened each time for three to five seconds and that he never went out on the back porch. He admitted that although he worked for Kinsella as a paid police informant from January to May and saw him at least once a week during that period, he did not tell Kinsella about the incident until May of 1975. He admitted that he never saw Akins take or remove anything from Michael Coleman.

*Mrs. Cornelius Cowens*

On January 10, 1975, she lived on the second floor of an apartment building at 5106 West Van Buren. Her grandson Michael Coleman lived with his family on the first floor. At approximately 8 a.m. Michael was in her apartment and, after using her phone, he left. At approximately 11 a.m. she received another phone call from an unidentified caller who said, "if you don't get $60, Michael Coleman will be dead." About half an hour later, she saw Michael "in the bed" after "they had brought him home." After calling an ambulance for him, she gave $60 to Maurice Coleman, Michael's younger brother. Maurice went outside, and when she looked out the window, she saw a man sitting in an old white car. She later accompanied Michael to Loretto Hospital.

On cross-examination she acknowledged that she could not recognize the individual sitting in the white car. She also acknowledged that Michael Coleman did not tell her that defendants Daniels, Terry or Akins beat him up.

*Maurice Coleman*

At 11:15 a.m. on January 10, 1975, he talked with his grandmother about a phone call she had received. About 45 minutes later, an old white

car pulled up in front of their residence and his brother Michael staggered out. After he helped Michael inside, his grandmother gave him $60. He went outside to the car and handed the money through an opened window to one of the two men sitting in the car. When he went to the police station the next day to view a lineup, he saw a car parked across the street from the station. It was the same car his brother had staggered out of. He went inside the station, viewed a five or six man lineup, and identified Ernest Terry as the man who had accepted the $60.

On cross-examination he acknowledged that he did not tell the police that the white car had a broken taillight. He estimated that he looked into the car and at Terry for about 30 seconds. He acknowledged that on January 10, 1975, he only described Terry to the police as a black male with a mustache and combed-back hair, and that when the police showed him several photographs, he did not identify a photograph of Terry.

*Thomas Kinsella, Chicago Police Officer*

In May of 1975, he was assigned to the narcotics section of the Chicago Police Department. Andrew Williams had worked for him as a paid informant on 12 cases since November of 1974. In May, he asked Williams if he had any information on a fight or beatings which took place at 311 South Bell. After Williams said that he did, he set up an interview between Williams and Area 4 homicide investigators.

On cross-examination, he acknowledged that the first case Williams worked on for him was the purchase of heroin from Roosevelt Daniels, and that from January to mid-March of 1975 when Williams worked on his last case, he spoke to Williams approximately four times a week. Although he spoke to Williams about twice a week from mid-March until May, he never questioned Williams about the events of January 10, 1975, and Williams never offered any information. He denied knowing that Williams was a narcotics addict, or telling Williams that Roosevelt Daniels beat and killed Michael Coleman. He further denied paying Williams money in May to talk about the homicide he observed.

*Dr. Yuksel Konakci, a physician and pathologist at the Cook County Morgue.*

He performed an autopsy on Michael Coleman on January 11, 1975, and concluded that Coleman died of extensive trauma resulting from injuries to his chest and abdomen. Those injuries were consistent in appearance with injuries caused by a beating with pieces of boards and pipes.

On cross-examination he conceded that he did not know what objects Coleman was struck with. He stated that as of his examination on January 11 at 10 a.m., Michael Coleman had been dead for more than 12 hours.

### Steven Barnas, Chicago Police Investigator

At approximately 3:00 p.m. on January 10, 1975, he and his partner, Investigator Jack Stewart, went to Loretto Hospital and examined the dead body of Michael Coleman. They took Coleman's clothing to the Area 4 Homicide office, where they examined it. They recovered a piece of paper on which the number "421-1128" and the names "Ernest or Roosevelt" were written.

On cross-examination, after he examined his police report, he acknowledged that on May 23, 1975, Andrew Williams told him and Stewart that at the incident in question, Curtis Akins went to the back porch and pulled a watch and ring off of Michael Coleman. He acknowledged that the report indicated that Williams said that Roosevelt Daniels and Curtis Akins "beat on" Michael Coleman, but there was no indication in that report that Williams saw Terry beat or kick Coleman.

### Eddie B. Hill

In January of 1975, he knew Roosevelt Daniels. He knew that Daniels lived on the third floor of the building at 321 South Bell, directly across the street from Crane High School. Curtis Akins lived on the first floor of the same building. He called Roosevelt Daniels on the telephone approximately seven times, and knew his phone number to be "421-1128."

### Sister Paulissa, a Roman Catholic nun, and registered nurse at Loretto Hospital

Sometime after 1:00 p.m. on January 10, 1975, she talked to Michael Coleman in the emergency room at Loretto Hospital. He told her that "Ernest and Roosevelt" had beaten him with sticks and a pipe near Crane High School. He seemed to be in fear of death, and said, "God help me. Help me" and "I am not going to make it. Please call my grandmother." Coleman died an hour later.

On cross-examination she conceded that, to her knowledge, no one told Coleman that he was going to die, and that he said only "Ernest and Roosevelt," but did not use any last names.

### For the Defense

### Walter Siemieniak, Chicago Police Investigator

On January 10, 1975, he and his partner, Investigator Bober, interviewed Maurice Coleman, and showed him three photographs, one of which depicted Ernest Terry. Coleman did not point out any of the photographs as being that of the driver of the car that had "dropped off" his brother. Coleman did not describe the driver of the car or the car itself.

On cross-examination he acknowledged that when he showed

Coleman the photographs, Coleman said that he couldn't recognize anybody in the photographs and would have to see them in person.

*Jack Stewart, Chicago Police Investigator*

On May 23, 1975, he and his partner Investigator Barnas, interviewed Andrew Williams. Williams said that on January 10 he saw Roosevelt Daniels and Curtis Akins beat Michael Coleman, and saw Akins take Coleman's watch and ring. Williams did not say that he saw Roosevelt Daniels strike Coleman with a pipe or two-by-four.

*Lee Anderson, Chicago Police Investigator*

He interviewed Maurice Coleman on January 10, 1975. Coleman described the car his brother was brought home in as being a white 1963 Oldsmobile with a broken right rear taillight. On January 11, he and his partner, Investigator Shine, took Coleman to the 11th District police station. As they approached the station, Coleman saw the vehicle in question outside the station and said, "that is the car. Let me out." When they examined the car, he did not see any damage to the taillight. Coleman recalled that the window and fender were damaged, and said that he had not remembered these details earlier because he had been scared.

OPINION

■■■ Dealing with Akins' contention that he was not convicted of armed robbery beyond a reasonable doubt also requires review of Terry and Daniels' convictions for the same offense. We note that the armed robbery indictment returned by the grand jury against all three defendants charged that they "by the use of force and while armed and with a dangerous weapon, took an amount of United States Currency (the exact amount of which is unknown to said Grand Jurors) from the person and presence of Michael Coleman." However, at trial the only proof adduced in connection with the robbery concerned the taking of a watch. It is clear from the record, and conceded by the State at oral argument, that the taking of a watch is not referred to in the indictment, and that the taking of currency was not proved or even mentioned at trial. In a criminal trial, it is the burden of the prosecution to prove beyond a reasonable doubt all material facts of the offense as charged by the indictment. (*People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432; *People v. Corbishly* (1927), 327 Ill. 312, 158 N.E. 732.) By utterly failing to introduce proof to conform to the charge in the indictment, the State failed in its burden of proof at trial. The State nevertheless asserts that the evidence adduced proved that Akins forcibly took Michael Coleman's watch. The evidence referred to is Andrew Williams' testimony that Akins said he was going to "get something" from the back porch where Coleman and defendants were, that Akins soon came back and showed him a watch, and that he

then went back to the porch to see if he could "get something else." The State concedes that this evidence is circumstantial, but argues that it is sufficient to prove the robbery of Coleman's watch by Akins. We disagree. As we stated above, the State failed in its duty to prove the charges in the indictment beyond a reasonable doubt. We note additionally that where a conviction is based on circumstantial evidence, the evidence relied on must produce a reasonable and moral certainty that the accused is guilty of the crime charged. (*People v. Versher* (1977), 52 Ill. App. 3d 148, 367 N.E.2d 311.) Further, the circumstantial evidence may not leave unanswered any reasonable hypothesis of defendant's innocence. (*People v. Hamilton* (1977), 48 Ill. App. 3d 456, 363 N.E.2d 193.) These standards have not been met here. The State did not prove that Michael Coleman owned or wore a watch, and it certainly did not establish that the watch Akins allegedly had was taken from Coleman. Defendant Daniels and Terry were also convicted of armed robbery. Those convictions were not based upon any evidence adduced against them, but were instead reached under theories of accountability for Akins' actions. Based on the foregoing, all of the defendants' convictions for armed robbery must be reversed.

Defendants Terry and Daniels contend that their convictions for murder should be reversed. They argue that the trial court committed prejudicial error when it refused to allow their motion to amend their list of witnesses and introduce the testimony of a previously undisclosed witness. The offer of proof made after the denial of defendants' motion indicated that the witness, Arnold Gates, would have testified that on January 10, 1975, he spent the entire day with Andrew Williams, and Williams never went to 331 South Bell. The State points out that the supreme court's discovery rules require the defense to disclose the names and addresses of its intended witnesses upon the State's written motion, and that there is a continuing duty to disclose additional information. (See Ill. Rev. Stat. 1977, ch. 110A, par. 413 (d)(i) and 415(b).) Under Supreme Court Rule 415(g), (i), when a party fails to comply with a discovery rule, the trial court may exclude the evidence, grant a continuance, or "enter such other order as it deems just under the circumstances." (Ill. Rev. Stat. 1977, ch. 110A, par. 415(g)(i).) The State contends that because Gates' testimony was not disclosed until the last day of trial, the court's order that the evidence would be excluded was proper.

We disagree with the State's contention. "The basic purpose of a trial is the determination of truth" (*Tehan v. United States ex rel. Shott* (1965), 382 U.S. 406, 416, 15 L. Ed. 2d 453, 460, 86 S. Ct. 459, 465), and the purpose of the discovery rules is to prevent surprise or unfair advantage and to aid in the search for the truth. (*People v. Goodman* (1977), 55 Ill. App. 3d 294, 371 N.E.2d 168.) In *People v. Rayford* (1976),

43 Ill. App. 3d 283, 356 N.E.2d 1274, the Fifth District of this court dealt with an appeal from the exclusion of a witness whose testimony had not been disclosed to the State during pretrial discovery. In finding that the sanction of exclusion was overly harsh, the court noted the principles stated above and added that:

> "The exclusion of evidence is a drastic measure; and the rule in civil cases limits its application to flagrant violations, where the uncooperative party demonstrates a 'deliberate contumacious or unwarranted disregard of the court's authority.' (*Schwartz v. Moats*, 3 Ill. App. 3d 596, 599, 277 N.E.2d 529, 531; *Department of Transportation v. Mainline Center, Inc.*, 38 Ill. App. 3d 538, 347 N.E.2d 837.) The reasons for restricting the use of the exclusion sanction to only the most extreme situations are even more compelling in the case of criminal defendants, where due process requires that a defendant be permitted to offer testimony of witnesses in his defense. (*Washington v. Texas*, 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920.) 'Few rights are more fundamental than that of an accused to present witnesses in his own defense.' (*Chambers v. Mississippi*, 410 U.S. 284, 302, 35 L. Ed. 2d, 297, 308, 93 S. Ct. 1038, 1045.)" (43 Ill. App. 3d 283, 286-87, 356 N.E.2d 1274, 1277.)

In the instant case, Yates' testimony would have been to the effect that he was with Andrew Williams on the date in question and that Williams was never at the scene of the crime. This testimony was surely important to the defense and to the truth seeking process in that if it were believed by the jury, it would have totally discredited the testimony of the State's sole eyewitness. The State nevertheless argues that the denial of defendants' motion and exclusion of Yates' testimony was proper. The State first points to the tardiness of the motion. We note that in denying the motion, the court also cited the "late date" on which it was made. The record shows that jury selection in the case was commenced August 31, and trial was begun on September 3. Following the conclusion of testimony on that day the court, apparently for its own reasons and not on defendants' motion, continued the case until September 13. Trial resumed on that date, and defendants' motion to add Gates came during the presentation of their witnesses three days later. In light of this time sequence and in consideration of the potential importance of the testimony, it does not appear that the extra time required for the presentation of Gates' testimony would have resulted in a significant hardship to the jury or a deterioration of the trial process. The argument regarding the tardiness of the motion is further answered by defense counsel's statement that he had first learned of the offered testimony the day before. Although the State does not challenge this assertion, it argues that because Gates and

defendant Daniels had both been incarcerated in the Cook County Jail, defendant had "presumably" known of Gates testimony "for a long time." We disagree. In *People v. Jackson* (1977), 48 Ill. App. 3d 769, 363 N.E.2d 392, defendants, charged with beating a correctional officer, sought to introduce the testimony of certain previously undisclosed witnesses. In ruling that exclusion of the testimony was overly harsh, the Fourth District of this court stated that the State should have disclosed the witnesses to the defense, because "[t]he witnesses were all fellow inmates of the defendants, witnesses who were more clearly within the State's control than the defendants." (48 Ill. App. 3d 769, 771, 363 N.E.2d 392, 394.) The State's "presumption" that defendants should be charged with prior knowledge of Gates' testimony is highly speculative and cannot be the basis for the testimony's exclusion. Finally, the State argues that it would be unduly prejudiced if defendants' motion were granted because Andrew Williams "was no longer available," and Gates' testimony could therefore not be rebutted or impeached. This argument is totally unpersuasive. To require the State to maintain contact with its sole eyewitness during the course of a criminal trial is not an unreasonable burden, and the State's claimed failure to do so here cannot justify the exclusion of defendants' potentially exculpatory witness. Based on the foregoing, we conclude the exclusion of Arnold Gates' testimony was an overly harsh sanction and the denial of defendants' motion was erroneous. The murder convictions of Terry and Daniels are accordingly reversed and the cause is remanded so that each defendant may be given a new trial.

■■ In light of our disposition of this case, we need not comment upon all of Terry and Daniels' remaining contentions. We note that Terry contends that he was arrested without probable cause, and that certain impermissibly suggestive identification procedures tainted his in-court identification by Maurice Coleman. These issues should properly be resolved at a hearing in the trial court, where all of the relevant facts and circumstances may be adduced and considered. (See *People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) However, it appears from the record that no motion to suppress the arrest in Coleman's identification was made below, and no hearings on these issues were held. Accordingly, both issues are waived from consideration on appeal. (See *People v. Moore* (1969), 43 Ill. 2d 102, 251 N.E.2d 181; *People v. Summers* (1977), 49 Ill. App. 3d 70, 362 N.E.2d 1347.) Finally, we note that defendants have contended that their joint representation by one privately retained attorney denied them the effective assistance of counsel. The record shows that the attorney was originally retained by Akins, and public defenders were appointed to represent Terry and Daniels. Although the record shows only the withdrawal of Terry's appointed counsel, it is clear

that all three defendants were represented at trial by their private attorney. Unlike situations in which there is inherently a conflict of interest (see, *e.g., People v. Kester* (1977), 66 Ill. 2d 162, 361 N.E.2d 569), the mere joint representation of criminal co-defendants, such as occurred below, is not *per se* violative of the guarantee of the effective assistance of counsel. (*Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173.) To show that there was ineffective assistance of counsel because of such joint representation, defendants must show an actual conflict of interest manifested at trial. (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.) Defendants herein have not shown any actual conflict, and none appears in the record. Defendants attempt to create a conflict through speculation and conjecture as to what their counsel might have done. However, in *People v. Berland* (1978), 74 Ill. 2d 286, 301, 385 N.E.2d 649, 655, our supreme court specifically rejected the suggestion that such speculative and hypothetical conflicts could be the basis for disturbing a judgment. Under *Berland,* defendants are also incorrect in asserting that the trial court erroneously failed to inquire as to whether a conflict existed. As we have noted, defendants were represented by a privately retained attorney. Further, no objection to this joint representation was made at trial, and no actual conflict was shown. Under such circumstances, judicial inquiry was not required. 74 Ill. 2d 286, 305, 385 N.E.2d 649, 657.

Based on all of the above, defendants' convictions for armed robbery are reversed. Terry and Daniels' convictions for murder are also reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

MEJDA and WILSON, JJ., concur.