THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCUS BROOKS, Defendant-Appellant.

First District (1st Division)   No. 1—93—0216

Opinion filed January 8, 1996.

Michael J. Pelletier and Patricia Mysza, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Pette Plass, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

A defendant in a criminal case has the fundamental right to present his defense to the trier of fact. In this case, the trial judge excluded the defendant's alibi defense because of a minor infraction of the discovery rules. We find the sanction of exclusion was too harsh. For that reason we reverse the defendant's murder and armed robbery convictions and remand the case for a new trial.

EVIDENCE AT TRIAL

The State presented 10 witnesses during its case in chief. This is a summary of their testimony.

On October 8, 1989, at about 7 p.m., Tracy Abrams, Lee Fredericks, Cherrelle Spencer, William Colbert, and Shelby Odom were on the front porch of Abrams' home at 4416 South Prairie in Chicago. Two men, one wearing a camouflage jacket and one wearing a Bears

jacket, approached the porch and said they were police officers. Both men had guns. Defendant later was identified as the man wearing the camouflage jacket.

As the men approached, Cherrelle was walking down the stairs. The man in the Bears jacket grabbed Cherrelle as she walked down the stairs, stuck a gun in her stomach, called her "Bitch," and told her that she was not going anywhere.

The men told everyone to remove their jackets and shoes. All except Fredericks removed their jackets and shoes and put them in a pile at the bottom of the stairs. Fredericks attempted to run into the building. The man in the Bears jacket shot him. Defendant told the others on the porch to get down and if they moved they would get the same thing. Defendant then picked up the jackets and their money. He said if anyone followed the two men, they would shoot Cherrelle. Defendant told the people on the porch to say a gang sign, and if they did not say it, they would kill Cherrelle.

The men took Cherrelle at gunpoint down the street to the corner. Defendant's partner held the gun on Cherrelle. While walking down the street, Cherrelle's friend, Vernita Bland, passed by. The man holding the gun on Cherrelle told her to hug him. She did. Cherrelle then walked away from the two men.

Officer Troy Williams and his partner arrived at the scene. When he entered the hallway he saw a young black male lying on the floor in a puddle of blood. The victim of the gunshot wound was identified as Lee Fredericks. Although Fredericks was alive at that time, he died later that evening. The medical examiner testified that Fredericks died of a gunshot wound inflicted at a close range.

The victims gave descriptions of the offenders to the police. Abrams informed the police that one of the offenders had the nickname "Shawn." He had heard defendant called "Shawn" around the neighborhood of 42nd and Prairie. Colbert knew the defendant from when he lived near 44th and Prairie in 1983 and 1984. He told the police that defendant wore thick glasses. Abrams told the police that defendant had a .357 gun and defendant's partner had a 9 millimeter gun.

Officer Williams told Detective Oliver, a gang specialist, that one of the offenders had a possible nickname of "Shawn." Detective Oliver looked up the nickname of Shawn in his files and came up with defendant's name. He passed this information to Officer Armata. Officer Armata obtained a picture of the defendant. Officer Armata showed defendant's picture to Abrams along with five other photographs. Abrams picked out defendant's picture and identified defendant as one of the men involved in the robberies and murder. After

defendant was in custody, Officer Armata recovered defendant's camouflage jacket from defendant's mother.

On October 15, 1989, Tracy Abrams, Cherrelle Spencer, and William Colbert viewed lineups at separate times. They each identified the defendant as one of the men who committed the robberies and the murder. A picture of the lineup was not presented at trial because the police camera was not working at the time of defendant's lineup.

For the defense, Mario Cruz and Victor Hubbard testified that defendant was a peaceful person. Hubbard stated that defendant was a law-abiding citizen and that he was honest. Hubbard maintained that defendant was not known as Shawn.

Daisy Arroyo, defense counsel's secretary, testified that she was present at an interview with Cherrelle Spencer in which Spencer stated that defendant was arrested 15 minutes after the armed robberies and the murder. Spencer also told her that she was able to identify defendant in a lineup 20 minutes after the crime. Defendant was wearing a camouflage jacket in the lineup.

Defendant's sister, Cheryl Coates, testified that defendant had been accepted by the postal service for a job beginning October 10, 1989. Coates said that she heard Abrams say he had never heard of defendant being called by the nickname of Shawn, and that Abrams said Cherrelle Spencer was not present during the armed robberies and the murder.

Defendant testified. He said he did not commit the armed robberies and murder. Defendant voluntarily surrendered himself to the police. Defendant had an acceptance letter for a job with the postal service. He was a member of the army reserve. Defendant identified his camouflage jacket. He said he only wore it when he was in the army reserve. The jacket had defendant's name on it. He testified that he had difficulty seeing at night even with his glasses; however, his vision did not prohibit him from serving in the army reserve.

The jury found defendant guilty of first degree murder and guilty of four counts of armed robbery. Defendant was sentenced to 50 years for murder and a concurrent sentence of 10 years for the armed robberies in the Illinois Department of Corrections.

OPINION

THE ALIBI DEFENSE

The record reflects several attempts by the defendant to notify the State of his alibi defense:

(1) On November 16, 1990, the defendant listed three witnesses who would testify to his alibi;

(2) On November 29, 1990, the defendant filed another answer. He listed the names and addresses of 10 "additional alibi witnesses";

(3) On May 26, 1992, another answer was filed. This one listed the names of three alibi witnesses, including Francis Hawkins; and

(4) On September 18, 1992, Cheryl Coates was disclosed as an additional alibi witness.

Although the case was set for trial on August 17, 1992, it was continued over the State's objection to September 21, 1992. On that day, the defendant filed a supplemental answer to discovery. This one said:

> "[T]he defendant will assert the defense of alibi and will present evidence that he was in the vicinity of 2946 West Lexington, Chicago, IL, during the hours of 9 a.m. to 10:30 a.m. on the date of the alleged offense and will call the following additional witnesses:
>
> 1. Theodore Teague, 2822 West Lexington, Chicago, IL.
> 2. Trina Davis, 2858 West Lexington, Chicago, IL.
> 3. Francis Hawkins, 2940 West Polk, Chicago, IL."

Both defense counsel and the defendant signed the answer. The trial judge signed the answer after writing: "Subscribed and sworn to before me this 21st day of Sept. 1992."

The State made no objection to the form of the supplemental answer.

The case was continued and jury selection began on September 29, 1992.

In his opening statement, defense counsel promised the jury an alibi defense. After the State rested its case, the defense called Francis Hawkins, one of the listed alibi witnesses. This was day nine of the trial.

Hawkins told the jury that on October 8, 1989 (the day of the crime), at about 6:30 p.m., she and the defendant were at a friend's house for dinner. The address was 2858 West Lexington. She said that after being with the defendant at that address for the next four hours, she left with her boyfriend and the defendant at about 10:25 p.m. Her testimony covered the time of the offense.

The State objected to Hawkins' testimony. The objection was based only on the variance between the address listed on the supplemental answer, 2946 West Lexington, and the address testified to by Hawkins, 2858 West Lexington. The State did not make any mention of the obviously incorrect time listed in the supplemental answer to discovery.

A conference in chambers followed. Defense counsel took the blame for what "might be a typing error." He contended the State was not taken by surprise. At first, the State denied its investigator

had talked to Hawkins. When the defense lawyer asked that Hawkins be allowed to make an offer of proof under oath, the State answered:

"Counsel, I sent out an investigator listing questions on everyone, including character witnesses, because I don't know who is who. If he talked to someone, I don't know. Because I never got a report back. And guess what, counsel, I don't care. It doesn't matter. We're not entitled to play guess where he is."

The trial judge sustained the State's objection. He instructed the jury that it was not to consider Hawkins' testimony. He precluded any witness, including the defendant, from testifying to the alibi. The defendant did testify. He denied committing the offense, but, consistent with the trial court's ruling, said nothing about where he was at the time of the offense.

There is no question that the supplemental answer to discovery varied from Hawkins' testimony and the intended testimony of the other alibi witnesses—by a city block. There is no evidence the mistake was intentionally made for tactical advantage or as an attempt to fabricate a twelfth-hour defense. It was a simple mistake, and not much of one at that.

It is apparent that the State was not overly concerned about the purported alibi. It had ample eyewitness testimony. It had the camouflage jacket. It never objected to the use of the word "vicinity" in the supplemental answer to discovery, although it could have if the exact location of the alibi was a source of worry. (See *People v. Osborne* (1983), 114 Ill. App. 3d 433, 437, 451 N.E.2d 1, 3 (where the court said: "We believe there is a corollary duty on both parties to seek clarification of disclosure which they deem inadequate or evasive").) After all, as Webster tells us, "vicinity" means "a surrounding area or district; locality; neighborhood." Webster's Third New International Dictionary 2550 (1986).

Most importantly, the State never claimed or attempted to show it was prejudiced by the one-block variance. In addition, the address of 2858 West Lexington should not have been a surprise to the State because another of the listed alibi witnesses, Trina Davis, lived there.

The purpose of the discovery rules "is to prevent surprise or unfair advantage and to aid in the search for the truth." *People v. Daniels* (1979), 75 Ill. App. 3d 35, 41, 393 N.E.2d 667, 673.

Illinois Supreme Court Rule 413(d)(iii) requires the defendant to disclose "specific information as to the place where he maintains he was at the time of the alleged offense." (134 Ill. 2d R. 413(d)(iii).) Rule 415(g)(i) contains sanctions for violation of the discovery rules by a party. The trial judge can "order such party to permit the discovery of material and information not previously disclosed, grant a contin-

uance, exclude such evidence, or enter such other order as it deems just under the circumstances." 134 Ill. 2d R. 415(g)(i).

When a lawyer wilfully violates a discovery rule or order, he becomes subject to appropriate sanctions by the court. 134 Ill. 2d R. 415(g)(ii).

When a discovery violation is wilful, and the State makes no showing of surprise or prejudice, the better option is to punish the offending attorney directly and personally, not to impose sanctions on his client. *People v. Foster* (1995), 271 Ill. App. 3d 562, 567, 648 N.E.2d 337.

This case does not involve a wilful violation of the discovery rules. The one-block variance was a slip of the mind, but of little moment in this case. If the State needed time to investigate the purported dinner party at 2858 W. Lexington, it could have asked for some time. The objection came at about the lunch hour on a Friday, leaving the weekend for investigation without any real interruption of the trial. That would have been an effective way to protect the State from prejudice or surprise. See *People v. Carrasquillo* (1988), 174 Ill. App. 3d 1023, 1032, 529 N.E.2d 603; also see *In re Lane* (1979), 71 Ill. App. 3d 576, 390 N.E.2d 82.

This was not a case where the State was lulled into a false sense of security. Before the trial began the State knew Francis Hawkins and others would testify to an alibi. If there was any attempt to interview any of those alibi witnesses, the prosecutor trying the case was not aware of it.

"It is a fundamental right of a defendant to present his theory of the case, no matter how overblown or specious it might appear." (*People v. Osborne*, 114 Ill. App. 3d at 437.) Excluding an accused's defense or his witness is an extreme sanction. It should be applied only in the most extreme situations. *People v. Foster* (1986), 145 Ill. App. 3d 477, 495 N.E.2d 1141; *People v. Rayford* (1976), 43 Ill. App. 3d 283, 356 N.E.2d 1274.

Sanctions for discovery violations are a matter for the trial court's discretion, and the judgment of the trial court is given great weight. (*People v. Morgan* (1986), 112 Ill. 2d 111, 492 N.E.2d 1303.) But sanctions are designed to accomplish the purpose of discovery, and "it is clear the imposition of sanctions should not encroach on a fair trial." *People v. Pondexter* (1991), 214 Ill. App. 3d 79, 85, 573 N.E.2d 339, 343.

■ The extreme sanction of exclusion in this case deprived the defendant of his defense. "This was not and is not the intent of the rule." *People v. Dickerson* (1983), 119 Ill. App. 3d 568, 572, 456 N.E.2d 920, 924.

In this case, the prejudice to the defendant caused by the striking of his defense is obvious. His lawyer promised the jury an alibi defense, but could not deliver. The jury heard Hawkins testify to an alibi, then was told to disregard it. The defendant denied committing the crime, but never was able to tell the jury where he was at the time. The defendant was deprived of his defense despite the failure of the State to make any showing of surprise or prejudice. "Such a result offends our system's fundamental tenets of due process." *People v. Williams* (1977), 55 Ill. App. 3d 752, 758, 370 N.E.2d 1261, 1265.

The State contends the jury would not have believed the alibi defense anyway. Perhaps not. But that is a matter better left to the jury. We believe striking the alibi defense deprived the defendant of a fair trial. For that reason, we reverse his convictions and remand the case for a new trial.

## THE MOTION TO SUPPRESS EVIDENCE

The defendant filed a motion to suppress the camouflage jacket seized from his bedroom by police officers. Because our resolution of the alibi exclusion issue requires a new trial, we will review the trial judge's denial of the defendant's motion.

The factual record on the search and seizure issue is vague. There was no fact hearing. The trial lawyers and the judge discussed the matter in chambers, then the judge denied the motion.

A few facts emerge from that conference.

It appears the defendant was living in his mother's home. The defendant's lawyer said police officers went to the defendant's mother's home at 3 a.m. without a warrant, while the defendant was in custody. He also said the defendant was paying his mother $100 a month in rent. The trial judge seemed to accept those representations.

The prosecutor told the judge that the defendant's mother consented to the search of the bedroom, signed a consent to search, and assisted the officers in finding the jacket. The trial judge accepted those representations, too.

No one said anything about the defendant's living arrangements with his mother.

The issue, then, was whether the trial judge correctly ruled that the defendant's mother had the authority to consent to the search of the bedroom.

A warrantless search conducted with the consent of a third party possessing common authority over the premises is not prohibited by the fourth amendment. *United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988.

Common authority is recognized in circumstances involving family, marital, or cohabitant relationships. (*People v. Foskey* (1990), 136 Ill. 2d 66, 87, 554 N.E.2d 192.) When a defendant lives with his parents or close relatives, courts will presume there is common authority over the bedroom sufficient to authorize the consent to search. *People v. Howard* (1984), 121 Ill. App. 3d 938, 946, 460 N.E.2d 432.

We use an objective standard to determine whether there was consent to enter the defendant's bedroom. That is, would the facts available to the officers " 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" *Illinois v. Rodriguez* (1990), 497 U.S. 177, 188, 111 L. Ed. 2d 148, 161, 110 S. Ct. 2793, 2801, quoting *Terry v. Ohio* (1968), 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880.

We cannot use hindsight. The circumstances at the time of entry control the inquiry into whether the police officers reasonably believed they had been given consent to enter. *People v. Henderson* (1990), 142 Ill. 2d 258, 299, 568 N.E.2d 1234.

Our cases adopt a theory of apparent authority. That does not mean police officers may "proceed without inquiry in ambiguous circumstances or always accept at face value the consenting party's apparent assumption that he has authority to allow the contemplated search." *People v. James* (1994), 163 Ill. 2d 302, 319, 645 N.E.2d 195, 203.

■ Based on the "facts" available to us, we do not believe the trial judge was in error. The police officers did not know the defendant paid rent to his mother. There was no evidence the defendant had exclusive possession of his bedroom. No one said the room was locked in the defendant's absence or that he had given explicit instructions not to allow anyone to enter. Under similar circumstances we have held the presumption of common authority was not overcome. *People v. Bliey* (1992), 232 Ill. App. 3d 606, 615, 597 N.E.2d 830.

CONCLUSION

Because the trial court erred in excluding the alibi defense, we reverse the defendant's convictions of murder and armed robbery and remand this case for a new trial.

Reversed and remanded.

BUCKLEY and BRADEN, JJ., concur.