THIRD DIVISION

FILED: 05/21/03

No. 1-01-0531

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. )

)

HAKIZIMANA SCOTT, ) Honorable

) Stuart E. Palmer,

Defendant-Appellant. ) Judge Presiding.

JUSTICE HOFFMAN delivered the opinion of the court:

Following a jury trial, the defendant, Hakizimana Scott, was found guilty of first degree murder and sentenced to 55 years in prison.  On appeal, the defendant contends that: (1) the trial court erred in barring the testimony of a defense witness as a discovery sanction; (2) defense counsel provided ineffective assistance in that she failed to comply with discovery rules, thus resulting in the witness in question being barred; (3) he was denied a fair trial as a result of certain comments the prosecutor made during closing arguments; and (4) the trial court erred in failing to appoint new counsel to represent him on his 
pro
 
se
 motion for a new trial or to inquire into the allegations of ineffective assistance of counsel stated therein.  For the following reasons, we reverse the defendant's conviction and sentence and remand for a new trial.

The defendant and Maurice Hughes were indicted for the December 31, 1994, murder of Dawnyell Freeman.  Separate but simultaneous trials were conducted.  At the defendant's jury trial, the State presented, 
inter
 
alia
, the testimony of Lashon Randle and Theorplus Bijou that Hughes shot the victim after the defendant handed Hughes a gun. Hughes and the defendant were both convicted of first degree murder and sentenced to extended-term sentences of 80 years in prison. This court reversed the defendant's conviction and remanded for a new trial.  
People v. Scott
, No. 1-97-0411 (1999) (unpublished order under Supreme Court Rule 23).  It is from his conviction following the jury trial conducted on remand that the defendant now appeals.

On remand, the case was set for trial on September 18, 2000.  On that date, the court conducted a pre-trial conference and continued the matter to September 19 for trial.  On September 19, both sides answered ready for a jury trial.  That same day, before jury selection commenced, defense counsel filed a supplemental answer to discovery in which she named, for the first time, Mary Clements, an investigator for the public defender's office, as a potential defense witness.  The prosecutor informed the trial court that Clements was "an absolutely new person" and that he had just learned of defense counsel's intention to add her as a possible witness by way of a message he retrieved from his voice mail two days earlier.  The prosecutor further stated that defense counsel had not answered his inquiries as to the subject matter of Clements' proposed testimony and that Clements was "not around to talk to."  He requested a proffer as to the content of Clements' proposed testimony.  Defense counsel stated that she had informed the prosecutor's co-counsel the previous week that her investigator, Clements, would be added as a potential witness.  Defense counsel further stated that, although Clements had been attending a seminar out of town, she had returned and the defense would make her available to the State.  In response to questioning from the court, defense counsel represented that Clements had interviewed Lashon Randle and that Randle had "made some variances in his statement from the first trial."  Specifically, defense counsel stated that Randle told Clements that "he did not see [defendant] hand the gun to Mr. Hughes."  According to defense counsel, Clements had not prepared a written report regarding her interview with Randle, which had taken place in April 2000.  Defense counsel further informed the court that Randle had indicated to Clements that he would return to the public defender's office and give a handwritten statement but that he never did so.  The trial court barred the defendant from calling Clements as a witness.

The case proceeded to trial, and the following evidence was presented.

Lashon Randle testified that, around 8 p.m. on December 31, 1994, he was standing in front of the home of his friend, Theorplus Bijou, which was located on the 1100 block of North Leclaire Avenue in Chicago.  Also present were Bijou, Maurice Hughes, Nakia Davis, and the defendant.   Randle testified that his cousin, the victim,  drove up, exited her car, and spoke briefly with him.  The victim then laughed at a statement Hughes made and walked toward her car.  Hughes told the victim that he had "something" for her, walked in front of her car, and then called to the defendant, who was standing on the curb.  Randle testified that, although Hughes called to the defendant twice, the defendant never moved toward Hughes.  Hughes then walked up to the defendant, who removed a gun from his waistband and handed it to Hughes.   After getting the gun from the defendant, Hughes walked in front of the victim's car and started shooting at her as she sat in the driver's seat.  Randle testified that, after the shooting, he saw Bijou attempting to "unjam" a gun.  Randle spoke to police officers when they arrived and told them what he had seen, although he acknowledged that he did not tell the officers that Bijou had a gun.

Randle acknowledged that he had previously been convicted of possession of a controlled substance and sentenced to one year of probation. 

On cross-examination, defense counsel asked Randle, "did you contact the Public Defender's Office last April?"  Randle responded, "No."  The State then objected.  At a sidebar, the trial court ruled that defense counsel could not ask any further questions along this line as, in light of the ruling barring Clements from testifying, she did not have the ability to impeach Randle on the issue.  Defense counsel asked the court for permission to withdraw as counsel.  She stated that she was present during Clements' conversation with Randle and could "prove it up."  The trial court denied this request, noting that, like Clements, defense counsel had not been disclosed as a potential witness.

Bijou's testimony regarding the events leading up to the shooting essentially corroborated Randle's.  In relevant part, Bijou testified that, after the victim got into her car, Hughes called to the defendant twice, but the defendant did not approach Hughes.  Hughes then walked over to the defendant, who removed a gun from his waistband and gave it to Hughes.  According to Bijou, Hughes moved in front of the victim's car and began firing.  At that point, Bijou fired two shots at Hughes with a .380 caliber gun, which then jammed.  Bijou did not speak to police at the scene of the shooting, but went to the police station later that evening and reported what he had seen.  Bijou admitted that, when he spoke to the police, he denied belonging to a street gang and denied having possessed or fired a gun at any point that evening.

Bijou acknowledged that he had previously been convicted of burglary, possession of a controlled substance, delivery of a controlled substance, violation of probation, and two separate counts of possession of a firearm.  Finally, Bijou stated that, as of the date of his testimony, there was a charge of retail theft pending against him.  He testified that he had not been offered any deal with respect to that pending charge in exchange for his testimony in this case.

Kevin Campbell testified that, around 8 p.m. on the night in question, he was driving down the 1100 block of North Leclaire Avenue when he saw Hughes raise a gun and heard gunshots.  Campbell did not see the defendant.

Following the shooting, the victim was taken to the hospital, where she remained until her death on January 11, 1995.  An autopsy revealed the cause of her death was multiple gunshot wounds.  Forensic evidence established that a bullet recovered from the victim's body was fired from a nine millimeter semi-automatic weapon, as was a cartridge case found in the middle of the street at 1136 North Leclaire Avenue.  A fired bullet found in the victim's car was so damaged that the type of firearm from which it was fired could not be determined.

Retired Chicago police detective Hugh Conwell testified that, on January 14, 1995, he showed a photographic array first to Randle and, later that day, to Bijou.  Both men identified Hughes as the man who shot the victim and the defendant as the man who handed Hughes a gun. 

Chicago police detective Kevin McDonald testified that, on May 15, 1995, Randle and Bijou each viewed a lineup.  Both men identified Hughes as the person who shot the victim and the defendant as the person who handed Hughes a gun just prior to the shooting.

The defendant testified on his own behalf.  He stated that, on the night in question, he accompanied Hughes and Davis to the 1100 block of North Leclaire Avenue, where Davis lived. According to the defendant, Hughes had given him a nine millimeter gun earlier that evening, asking him to hold it.  The defendant had the gun in his coat pocket.  The defendant testified that he was standing in front of the Davis home, while Hughes and Davis walked down the street towards Randle and Bijou, who were standing two doors down in front of Bijou's house.  The victim arrived and spoke to Bijou and Randle.  She then exchanged words with Hughes, after which Hughes called to the defendant, telling him to "come here."  The defendant testified that he did not respond.   Hughes called the defendant a second time, and again he did not respond.  According to the defendant, Hughes then walked up to him and grabbed the gun out of his pocket.   The defendant testified that he was surprised by this and did not know that Hughes was going to do it.  Hughes then walked into the street.  The defendant lost sight of Hughes, after which he heard gunshots.

The defendant acknowledged that, on the night of the shooting, he did not tell the police what he had seen.  He further admitted that, when the police interviewed him following his arrest in May 1995, he gave them several different accounts as to what had happened that evening, none of which was the same as his trial testimony.  He testified that he was scared and just told the police officers what they wanted to hear.

The trial court allowed the defendant to make an offer of proof by calling Mary Clements to the stand outside the presence of the jury.  Clements testified that she is an investigator employed by the office of the Cook County public defender.  According to Clements, on April 12, 2000, she met with Randle at her office.  Also present were Randle's brother's girlfriend and defense counsel.  Randle told Clements that he wanted to "tell the truth about what really occurred" on the night of the shooting and stated that he did not see the defendant hand Hughes a gun.  Randle further stated that he did not want to tell his family that his previous statement had been a lie.  Clements suggested that Randle speak to his family about the matter and return to her office on another day.  Randle agreed to return to Clements' office on April 27, 2000, in order to make a videotaped recantation statement.

Clements testified that, on April 27, 2000, Randle called and rescheduled his appointment for May 1, 2000.  On May 1, 2000, Clements found Randle, who was in the building where her office is located because his brother had a court date.  Randle was with his father and his brother's girlfriend.  Randle told Clements that it was a bad time for him to make the videotaped statement as his father was with him and he had not told his father he intended to do so.  According to Clements, Randle stated that he wanted to come in to the office on another date to make the statement.  After that date, however, he never called to reschedule.  Clements' subsequent attempts to locate Randle were unsuccessful.  Clements testified that she did not write a report regarding her conversations with Randle.

Following Clements' testimony, the State asked the trial court to let stand its earlier ruling barring her testimony.  After further argument from the parties on the issue, the trial court stated in part as follows:

"I don't think I've seen a clearer discovery violation than this.  It is my feeling that, first of all, just the idea of having an eyewitness to a murder case in the public defender's office being interviewed for an hour-and-a-half and giving a recantation without one written piece of paper, without one note is, in my opinion, highly incredible. ***

* * *

You know, in my opinion, the defense has been playing hide the ball.  This was an ambush.  And I don't believe that ambushes are appropriate.  I think the discovery rules apply to everybody.  If the State tried to do this, I wouldn't let them do it.  And if the defense tries to do it, I'm not going to let them do it."

The trial court repeated its ruling that Clements could not testify.

In rebuttal, the State introduced into evidence a certified copy of the defendant's 1996 conviction for possession of a controlled substance.

The jury found the defendant guilty of first degree murder.  Defense counsel filed an amended motion for a new trial on the defendant's behalf in which she argued, 
inter
 
alia
, that the trial court erred in barring the defendant from presenting the testimony of Clements and overruling the defendant's objections to certain comments the prosecutor made during closing arguments.  Additionally, the defendant filed a 
pro
 
se
 "First Amended Motion for Finding of Acquittal or for a New Trial or an Evidentiary Hearing."  The defendant argued, 
inter
 
alia
, that his trial counsel provided ineffective assistance in that her failure to tender Clements to the State as a witness deprived him of his Sixth Amendment "right to have compulsory process for obtaining witnesses in his favor."

The trial court denied the motions for a new trial, and sentenced the defendant to 55 years in prison.  The defendant brought the instant appeal.

We first address the defendant's contention that the trial court erred in barring Clements from testifying.  The defendant does not contest the fact that his counsel committed a discovery violation by failing to disclose Clements as a possible witness at an earlier date.  He argues, however, that the trial court abused its discretion in imposing the harshest sanction available  He maintains that his rights to a fair trial and to present a defense were severely prejudiced by the court's order.

Supreme Court Rule 413(d)(i) provides that, upon motion of the State, a defendant must furnish the State with the names of any witnesses he intends to call at trial along with their relevant written or recorded statements.  134 Ill. 2d R. 413(d)(i).  Further, pursuant to Supreme Court Rule 415(b), a party has a continuing duty to disclose any additional material or information which is discovered after initial compliance with discovery.  134 Ill. 2d R. 415(b).  Rule 415(g) authorizes the trial court, upon finding that a party has violated a discovery rule or order, to "order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances."  134 Ill. 2d R. 415(g)(i).  The rule further provides that a counsel's wilful violation of a discovery rule or order "may subject counsel to appropriate sanctions by the court."  134 Ill. 2d R. 415(g)(ii).

The purpose of the discovery rules is to prevent surprise to or unfair advantage by either party and to aid in the search for truth.  
People v. Brooks
, 277 Ill. App. 3d 392, 397, 660 N.E.2d 270 (1996).  Sanctions are intended to accomplish the purpose of discovery, not to punish the offending party, and the imposition thereof should not encroach on a party's right to a fair trial.  
People v. Houser
, 305 Ill. App. 3d 384, 390, 712 N.E.2d 355 (1999).   Further, sanctions should be fashioned to meet the circumstances of the particular case.  
People v. Damico
, 309 Ill. App. 3d 203, 212, 722 N.E.2d 194 (1999).  The determination as to an appropriate sanction for a discovery violation lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion.  
People v. Mullen
, 313 Ill. App. 3d 718, 736, 730 N.E.2d 545 (2000); 
Houser
, 305 Ill. App. 3d at 390.  That said, however, we observe that few rights are more fundamental than an accused's Sixth Amendment right to present witnesses in his own defense.  
Taylor v. Illinois
, 484 U.S. 400, 408, 108 S. Ct.646, 98 L. Ed. 2d 798 (1988).  The defendant's right to compulsory process, like the discovery process itself, serves the purpose of ensuring that judgments are not founded on a partial or speculative presentation of facts.  
Taylor
, 484 U.S. at 411, 108 S. Ct at 654, 98 L. Ed. 2d at 812.  Illinois courts have stated that the sanction of excluding certain testimony or evidence is disfavored because it does not contribute to the goal of truth-seeking (
People v. Hawkins
, 235 Ill. App. 3d 39, 41, 600 N.E.2d 923 (1992)) and is appropriate in only the most extreme situations. (
Houser
, 305 Ill. App. 3d at 390; 
People v. Rayford
, 43 Ill. App. 3d 283, 356 N.E.2d 1274 (1976)).  A trial court order excluding evidence as a sanction for a discovery violation will be closely scrutinized on appeal.  
People v. White
, 257 Ill. App. 3d 405, 414, 628 N.E.2d 1102 (1993).  Nonetheless, in 
Taylor v. Illinois
, 484 U.S. 400, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988), the United States Supreme Court rejected the proposition that the sanction of excluding a defense witness from testifying is never appropriate and always constitutes a violation of a defendant's Sixth Amendment rights
.  The 
Taylor
 court stated:

"It may well be true that alternative sanctions are adequate and appropriate in most cases, but it is equally clear that they would be less effective than the preclusion sanction and that there are instances in which they would perpetuate rather than limit the prejudice to the State and the harm to the adversary process."  
Taylor
, 484 U. S. at 413, 108 S. Ct. at 655, 98 L. Ed. 2d at 813.

The 
Taylor
 court, however, declined to "attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case."  
Taylor
, 484 U.S. at 414, 108 S. Ct. at 656, 98 L. Ed. 2d at 814.

Factors which the trial court should consider in determining whether the exclusion of a witness is an appropriate discovery sanction are the effectiveness of a less severe sanction, the materiality of the witness' proposed testimony to the outcome of the case, the prejudice to the other party caused by the testimony, and evidence of bad faith in the violation of the discovery rules.  
White
, 257 Ill. App. 3d at 414.  In order to determine whether the trial court abused its discretion in barring Clements from testifying on the defendant's behalf, we must consider these factors in the context of the factual circumstances of this case.  
Boatmen's National Bank v. Martin
, 155 Ill. 2d 305, 314, 614 N.E.2d 1194 (1993)("A reviewing court must look to the criteria on which the trial court should rely to determine if the trial court abused its discretion.")

With respect to the first factor, the defendant asserts that a less severe sanction could have effectively cured any prejudice to the State resulting from his failure to disclose Clements as a potential witness at an earlier date.  He notes that defense counsel filed her amended answer to discovery naming Clements on Tuesday, September 19 and that she offered at that point to make Clements available to the State.  He maintains that, even without a continuance, the State would have been able to interview Clements prior to Randle's testimony on Wednesday, September 21 and prior to her own testimony, which could have taken place no earlier than Thursday, September 21, the day on which he began presenting his case.  The defendant further asserts that the trial court could easily have granted a short continuance or recess if necessary to allow the State to interview Clements.  The State contends that, in order to be prepared to properly respond to Clements' proposed testimony, it would have needed to interview not only Clements but other people as well.  In particular, it asserts that it would have needed to interview the girlfriend of Randle's brother, who, according to Clements, accompanied Randle to her office on April 12, 2000.  The State further asserts that it would have wanted to interview Randle's father in order to determine whether Randle ever discussed the alleged recantation with him.  We agree that, in order to cure the prejudice caused to the State by the defendant's failure to disclose Clements as a potential witness, it would have been necessary for the trial court to allow the State to interview persons other than Clements.  However, we also believe that a continuance would have allowed the State to conduct the necessary interviews and, thus, would have effectively cured any prejudice it suffered as a result of the discovery violation.  We also note that a continuance would have caused little difficulty as jury selection had not yet begun.

We next consider the materiality of Clements' proposed testimony.  The State acknowledges that Clements' testimony that Randle recanted his statement that he had seen the defendant hand Hughes a gun prior to the shooting is material evidence.  It apparently contends, however, that Clements' testimony, although material, would not have changed the outcome of the trial.  As will be discussed herein, we cannot say beyond a reasonable doubt that such is the case.  The State also points to 
People v. Cannon
, 244 Ill. App. 3d 45, 614 N.E.2d 17 (1992), where the court affirmed an order excluding a defense witness from testifying as a sanction for the defendant's failure to disclose the witness until after the State rested its case.  In urging reversal, the defendant in that case focused on the importance of the excluded testimony to his defense.  The 
Cannon
 court observed that, by following the rules of discovery, defense counsel could have ensured that the material evidence was heard.  
Cannon
, 244 Ill. App. 3d at 52.  The State argues that defense counsel here similarly could have ensured that Clements' testimony would be heard by simply following the rules of discovery.  No doubt this is true, and we agree with the proposition, implicitly stated in 
Cannon
, that the materiality of evidence alone will not prevent the preclusion of that evidence as a discovery sanction if other factors weigh in favor of such a sanction.  Nonetheless, materiality is a factor, and Clements' testimony is certainly material to the issue of the defendant's guilt.

The third factor we must consider in reviewing the propriety of the trial court's order barring Clements' testimony is the prejudice caused to the State by the proposed testimony.  Had the trial court allowed Clements to testify without giving the State an opportunity to interview her and certain other individuals, the State would clearly have suffered great prejudice as it would have been unprepared to cross-examine Clements or otherwise respond to her testimony.  Had the trial court, however, ordered a continuance to allow the State to interview the necessary individuals, we fail to see, and the State fails to demonstrate, how it would have been prejudiced.

We next consider the evidence of bad faith in the violation of the discovery rules, the final factor which a court must weigh in determining whether the exclusion of a witness' testimony is an appropriate sanction.  It is this factor which the State argues weighs most heavily in favor of affirming the trial court's order here.  The State notes that the trial court commented that it believed the defendant was "playing hide the ball" and that "[t]his was an ambush."  In support of its assertion that the defendant's wilful violation of discovery rules justifies the trial court's order excluding Clements' testimony, the State relies heavily on the Supreme Court's decision in 
Taylor
.

In 
Taylor
, the defendant was charged with attempting to murder a man during a street fight.  On the second day of trial, defense counsel moved to amend the defendant's answer to discovery, naming an additional witness.  Counsel stated that he had just been informed of the witness and that the witness had probably seen the entire incident.  Upon questioning, it was revealed that the defendant had informed trial counsel of the witness earlier, but that counsel had been unable to locate the witness.  
Taylor
, 484 U.S. at 403-04, 108 S. Ct. at 650, 98 L. Ed. 2d at 806-07.  The trial court permitted defense counsel to make an offer of proof by allowing the witness to testify outside the presence of the jury.  This testimony revealed that defense counsel had interviewed the witness the week prior to the start of the trial.  Further, the witness had not actually witnessed the street fight.  Rather, prior to the fight, he allegedly saw the victim and his brother with guns and heard them say that they were "after" the defendant.  The trial court found that the failure to disclose the witness in question was a blatant, wilful violation of discovery rules.  It barred the witness from testifying.  
Taylor
, 484 U.S. at 404-05, 108 S. Ct. at 650-51, 98 L. Ed. 2d at 807-08.  In rejecting the defendant's assertion that the trial court's sanction of excluding the witness' testimony was unnecessarily harsh, the Supreme Court stated that, based upon the circumstances of the case, 

"the inference that [defense counsel] was seeking a tactical advantage is inescapable.  Regardless of whether prejudice to the prosecution could have been avoided in this particular case, it is plain that the case fits into the category of willful misconduct in which the severest sanction is appropriate."  
Taylor
, 484 U.S. at 417, 108 S. Ct. at 657, 98 L. Ed. 2d at 815.

The State 
argues that the defendant's conduct in this case similarly "fits into the category of willful misconduct in which the severest sanction is appropriate."  It notes that, although Clements first met with Randle on April 12, 2000, the defendant did not disclose her as a potential defense witness until five months later, filing her amended answer to discovery on the day jury selection was to commence.  The State acknowledges that defense counsel apparently informed the prosecutor that she intended to add Clements as a witness several days before she filed her amended answer to discovery, but points out that Clements was out of town, and thus unavailable, at that time and, further, that defense counsel refused to inform the prosecutor of the subject matter of Clements' proposed testimony.   The State also points to the trial court's findings that the defendant was "playing hide the ball" and attempting to "ambush" the State by waiting to disclose Clements.  We, however, find the instant case to be distinguishable from 
Taylor
.

In 
Taylor
, defense counsel waited until the second day of trial before moving to amend his answer to discovery to disclose the witness in question, whom he represented to the court had probably witnessed the entire altercation.  The witness' testimony outside the presence of the jury revealed that he had not, in fact, witnessed the altercation.  The 
Taylor
 court noted that the witness' proposed testimony "rather dramatically contradicted defense counsel's representations to the trial court" (
Taylor
, 484 U.S. at 405, 108 S. Ct. at 651, 98 L. Ed. 2d at 808).  In the instant case, defense counsel filed her amended answer to discovery naming Clements as a possible witness, not after trial had commenced, as in 
Taylor
, but on the day on which jury selection was to begin.  Further, we reject the State's assertion that defense counsel here misrepresented to the court the content of Clements' proposed testimony. The State contends that defense counsel represented to the court that Clements would testify that Randle initiated contact with the public defender's office, thus "suggesting that he was anxious to recant his earlier statements," while Clements testified that she initially contacted Randle.  The portions of the trial transcript to which the State refers us do not support its contention in this regard.  Rather, on the referenced transcript pages, Clements testified only that "she was asked to be involved with a[n] interview of a person by the name of Lashon Randle" and that she met with him at the public defender's office.  On cross-examination, Clements testified that she had gone to the defendant's home in March 2000 and, when he was not at home, left her business card with a family member.  According to Clements, the defendant contacted her office in April 2000.  Although Clements did not explicitly state so, it would appear that the April 12, 2000, meeting resulted from the April contact initiated by the defendant.  
We find no evidence that defense counsel here, as in 
Taylor
, misrepresented to the court the content of the witness' proposed testimony.  Accordingly, while defense counsel's discovery violation in the instant case may have been deliberate, we do not believe it rose to the same level as that in 
Taylor
.

Having explained the bases upon which we find the instant case to be distinguishable from 
Taylor
, we find it necessary to briefly distinguish two other cases upon which the State relies in arguing that we must affirm the trial court's order excluding Clements from testifying.  In 
People v. Tinoco
, 185 Ill. App. 3d 816, 541 N.E.2d 1198 (1989), at the close of the State's case, the defendant sought to present two reputation witnesses that he had not previously disclosed, stating only that uncertainty regarding the witnesses' willingness to testify had precluded earlier disclosure.  Relying on 
Taylor
, the appellate court affirmed the trial court's order barring the witnesses from testifying.  The 
Tinoco
 court also commented that, although the defendant made an offer of proof as to the substance of the witnesses' proposed testimony, the trial court had apparently heard nothing in the offer of proof which, even if taken as true, would have affected the outcome of the bench trial.  
Tinoco
, 185 Ill. App. 3d at 827.  Similarly, in 
People v. Johnson
, 262 Ill. App. 3d 781, 635 N.E.2d 827 (1994), it was not until the State rested its case that the defendant revealed his intent to call two previously undisclosed witnesses, although he clearly knew of the witnesses earlier.  In affirming the trial court's order barring the two witnesses from testifying, the 
Johnson
 court noted that the defendant offered no explanation for his failure to disclose the witnesses earlier and that, as the defendant made no offer of proof as to the witnesses' proposed testimony, he failed to establish any prejudice resulting from the trial court's order.  
Johnson
, 262 Ill. App. 3d at 788.

Here, unlike in 
Tinoco
 or 
Johnson
, defense counsel named Clements as a potential witness prior to the commencement of trial.  Further, the defendant made an offer of proof, by way of Clements' testimony outside the presence of the jury, which established that he was clearly prejudiced by the order barring her testimony at trial.

In summary, we find that Clements' proposed testimony was clearly material and favorable to the defendant and that a less severe sanction than excluding Clements' testimony, namely a continuance to allow the State to interview the necessary witnesses, could have effectively  alleviated any prejudice to the State.   While we acknowledge the trial court's findings that defense counsel's failure to disclose Clements as a witness was deliberate, we cannot agree that the discovery violation was of such a nature as to justify the most severe sanction available.  Rather, we find this case to be similar to 
People v. Foster
,  271 Ill. App. 3d 562, 648 N.E.2d 337 (1995).  In 
Foster
, defense counsel filed no answer to discovery by the cut-off date set by the court.  When the case was called for trial a couple of months after the discovery deadline, the trial court barred the defendant from presenting the affirmative defense of self-defense.   Defense counsel offered no explanation for his failure to comply with the discovery order.  
Foster
, 271 Ill. App. 3d at 563-65.  On review, the 
Foster
 court found that the trial court abused its discretion in barring the defendant from presenting a defense.  It expressed sympathy with the trial court's frustration at defense counsel's complete lack of compliance with its discovery order.  The 
Foster
 court went on to conclude, however, that, rather than barring the defendant from presenting a defense, "the court had another option available that might not only have proved more effective, but also would have avoided the harsh consequences of depriving defendant of his only available defense."  
Foster
, 271 Ill. App. 3d at 567.  This option, according to the 
Foster
 court, was for the trial court to invoke the authority granted it under Rule 415(g)(ii) and sanction defense counsel personally, rather than sanctioning his client.  
Foster
, 271 Ill. App. 3d at 567.  Similarly, although we sympathize with the frustration the trial court in the instant case undoubtedly experienced when defense counsel disclosed a new witness on the day jury selection was to begin, we believe the court abused its discretion in imposing the harshest sanction available by excluding that witness' testimony.  Rather, the court had available to it the option of granting a continuance and, if it so wished, imposing sanctions upon defense counsel personally.  This option would have protected the State from prejudice, protected the defendant's right to present witnesses in his defense, and promoted the interests of justice by allowing all relevant evidence to be presented to the fact finder.

The State asserts that, even if we find that the trial court's order constituted an abuse of discretion, we must, nonetheless, affirm the defendant's conviction as the outcome of the trial would not have differed if the jury heard Clements' testimony.  It notes that, in addition to Randle's testimony, the jury also heard Bijou's testimony that the defendant handed Hughes a gun prior to the shooting.  It further asserts that aspects of Bijou's testimony were corroborated by Keith Campbell's testimony, thus bolstering Bijou's credibility.  The State maintains that the defendant's own testimony that Hughes took the gun from him and that he did not know that Hughes intended to do so must be judged in light of the fact that the defendant admitted having lied to the police repeatedly following his arrest. 

 We acknowledge that, if the jury had heard Clements' testimony, it might not have believed that Randle recanted his statement or might have believed that it was the recantation, rather than the initial statement, that was false.  We further acknowledge that, even if the jury believed that Randle never saw the defendant hand Hughes a gun, it might have, nonetheless, believed Bijou's testimony over the defendant's and convicted the defendant anyway.  However, the jury, faced with only one eyewitness implicating the defendant rather than two, might just as well have believed the defendant's testimony over that of Bijou and acquitted the defendant.  Although the State contends that Bijou's credibility was bolstered by the fact that Campbell's testimony corroborated certain aspects of his testimony, we note that Campbell merely testified that he drove down the 1100 block of North Leclaire Avenue on the night in question, saw Hughes holding a gun, and heard gunshots.   He did not see the defendant.  The trial court's order barring Clements' testimony can be considered harmless error only if we can say beyond a reasonable doubt that the jury's verdict would not have been different had it been allowed to hear Clements' testify that Randle recanted his statement that the defendant handed Hughes a gun just prior to the shooting.  
Damico
, 309 Ill. App. 3d at 214.  Because we cannot say beyond a reasonable doubt that the jury would have convicted the defendant of first degree murder if it had heard Clements' testimony, we cannot conclude that the trial court's order barring her from testifying was harmless error.  Accordingly, we must reverse the defendant's conviction and sentence and remand for a new trial.  
Brooks
, 277 Ill. App. 3d at 399. 

Due to our resolution of this issue, it is unnecessary for us to address the defendant's remaining contentions of error.

For the foregoing reasons, we reverse the defendant's conviction and sentence and remand for a new trial.  In doing so, we find that the evidence was sufficient to support the defendant's conviction, so that double jeopardy considerations do not prevent retrial.  
People v. Olivera
, 164 Ill. 2d 382, 393, 647 N.E.2d 926 (1995).

Reversed and remanded.

SOUTH, P.J., and WOLFSON, J., concur.