NOTICE
Decision filed 05/01/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230063-U

NO. 5-23-0063

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 20-CF-1145 |
| | ) | |
| NICHOLAS RICKMAN, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction and sentence on the offenses of first degree murder and armed robbery, where the State presented sufficient evidence for the jury to find defendant guilty beyond a reasonable doubt. The trial court did not err or abuse its discretion by excluding testimony of an undisclosed expert witness.

¶ 2    Following a jury trial in the circuit court of Madison County, defendant, Nicholas Rickman, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020))[1] and armed robbery (*id.* § 18-2(a)(2)) and sentenced to 32 years in prison followed by 3 years of mandatory supervised release (MSR). Defendant appeals, arguing that the State failed to prove him guilty beyond a reasonable doubt of both offenses. Defendant also contends that the trial court erred by excluding

---

[1]The trial court's docket entry on October 7, 2020, indicated that counts II and III merged with count I.

1

the testimony of the State's firearm expert as a sanction for a violation of the discovery rules. Alternatively, defendant argues that the trial court abused its discretion when it excluded all of the testimony of the State's firearm expert concerning gunshot residue. For the following reasons, we affirm.

¶ 3                                    I. Background

¶ 4       We limit our recitation to those facts relevant to our disposition of this appeal. We will recite additional facts in the analysis section as needed to address defendant's specific arguments.

¶ 5       On June 8, 2020, the State charged defendant by information with three counts of first degree murder, alleging that defendant, or a person for whom defendant was legally accountable, with the intent to kill or do great bodily harm to the victim, Sean D. Williams (count I) (*id.* § 9-1(a)(1)), or knowing such an act created a strong probability of death or great bodily harm to the victim (count II) (*id.* § 9-1(a)(2)), caused the victim's death. The State also alleged that defendant, while committing armed robbery (count IV) (*id.* § 18-2(a)(2)), a forcible felony, took property, including a .40-caliber firearm and cannabis, from the victim's presence of person by the use of force, in that defendant, or a person for whom defendant was legally accountable, shot and killed the victim (count III) (*id.* § 9-1(a)(3)).

¶ 6       The charges stemmed from a June 4, 2020, shooting in an alley behind the home of codefendant Deandre Richardson at 2569 Madison Avenue, Granite City, Illinois. Following a neighbor's 9-1-1 call, law enforcement found the victim shot and unresponsive in his black Kia Sorento. Several witnesses, whose testimony will follow, provided a description of two black males fleeing the alley following two gunshots. Testimony indicated that one of the black males, Richardson, had short hair and wore a hooded jersey with the number "23" on it, while the second black male, defendant, had short dreadlocks in his hair and wore a light-colored hooded shirt.

2

Shortly after arriving on scene, police pursued Richardson on foot until police found him crouched down on the side of a nearby home. After arresting Richardson, police canvassed the area and located a firearm belonging to the victim in the area where officers originally spotted Richardson. Police did not locate defendant on June 4, 2020. Instead, defendant turned himself in on June 9, 2020, to the Granite City Police Department accompanied by his attorney.

¶ 7    On October 3, 2022, defendant's five-day jury trial began. The following evidence was adduced.

¶ 8    A. Officer Daniel Grayson

¶ 9    Officer Daniel Grayson of the Granite City Police Department testified to the following. Officer Grayson responded to a 9-1-1 call for gunshots at 2569 Madison Avenue in Granite City at 10:22 p.m. on June 4, 2020. When he initially arrived in the alley behind Madison Avenue, an individual directed him to a vehicle parked in the rear driveway of 2569 Madison Avenue. At that time, Officer Grayson discovered the victim unresponsive in his car. Officer Grayson could not recall whether the doors to the victim's car were open or closed.

¶ 10    B. Dustin Cook

¶ 11    Dustin Cook, who lived at 2613 Madison Avenue, testified to the following. On June 4, 2020, Cook stood in his back driveway near the alley. Sometime between 10 p.m. and 10:22 p.m., Cook heard two gunshots 5 to 10 seconds apart. Cook "jumped up and ran to the alley to see where it *** came from." After the second shot, Cook saw two black males in their "late teens/early 20's" with "little twists on the top of their head[s]." One of the black males wore a "basketball jersey, camouflage basketball jersey with *** [a] No. 23," "[i]t was maybe a *** slip-over hoody, black pants," while the other black male wore a "light[er] hooded *** shirt ***, like *** a jogging sweatsuit *** and black sweatpants or jogging pants." Cook saw the two males in the alley

3

"handing or giving something back and forth to each other. I didn't make out what it was." Cook saw the two males "run[ ] south down that alley towards 25th Street." After the two black males left the alley, Cook ran to the parked vehicle and found the victim shot. Cook subsequently called 9-1-1 to report the shooting while "trailing the two individuals." When police arrived, Cook informed police where the black males ran.

¶ 12　On cross-examination, Cook clarified that he did not see the shooting. Immediately after he heard the first gunshot, he "was in the alley." Cook confirmed that he saw two individuals when he heard the second shot. Cook then clarified that when he heard the second gunshot he saw "at least one teenager in the [alley]." When Cook ran to the parked vehicle, he saw the passenger side door open. He could not recall whether the driver's side door was open or closed. On redirect examination, Cook testified that the males "appeared—they seemingly were passing something back and forth during the whole altercation. *** I can't be a hundred percent precise on every second of how everything went, but what I seen [*sic*] is what I seen [*sic*]."

¶ 13　C. Donovan Green

¶ 14　Donovan Green, Richardson's friend, testified to the following. Green testified that he and the victim were high school friends. On June 4, 2020, Green lived at 2569 Madison Avenue with Richardson, Richardson's mother, Shakila Bolden, and Richardson's younger brother, Kingston Willis. Green and Richardson shared a bedroom on the second floor. Prior to the shooting, Green returned home between 6 p.m. and 9 p.m. after playing basketball. When he arrived home, he saw Shakila, Richardson, Kingston, and Levonte Bolden, Richardson's older brother. Shortly thereafter, Richardson went upstairs to the shared bedroom, while Green, Shakila, Kingston, and Levonte watched a movie downstairs. At 10 p.m., defendant came to the house and met Richardson

4

in his bedroom. While upstairs, defendant messaged Green on Facebook. The State questioned Green about the June 4, 2020, Facebook messages between defendant and Green:

> "A. [THE STATE:] Donoe [(Donovan)] come up there.
> Q. And then did you respond?
> A. Yes.
> Q. How?
>
>                        * * *
>
> *** I said, damn that's far, what's up.
> Q. *** And then what did [he] say?
>
>                        * * *
>
> A. He said, 'listen to the plan let us kno[w] if this good.'
> Q. And how did you respond?
> A. I said[,] 'hold on here I come.'
> Q. And did you go?
> A. No.
> Q. And then what did he say?
> A. 'Aye come here come.'
> Q. And then what happened?
> A. He called me."

While on the phone, defendant asked Green to come upstairs, but Green refused. Sometime after, Green saw defendant and Richardson leave the house together through the back door.

¶ 15 Approximately 5 to 10 minutes after defendant and Richardson walked outside, Green heard two gunshots. Green and Levonte immediately walked outside. Green observed a car door wide open with a "body hanging out of the door." He did not see Richardson or defendant. Green then admitted that he lied to police during an initial interview on June 5, 2020, when Green said that he walked outside following the gunshots and saw Richardson. He admitted that he lied because he "was scared and wasn't trying to get [Richardson] in trouble." Green called 9-1-1. Green admitted that he had a loaded 9-millimeter Springfield XD firearm inside of a backpack in the bedroom he shared with Richardson, and Richardson knew about this firearm. Green admitted that he did not tell police in his initial interview that he put his gun in the shared bedroom on June 4, 2020. Following this interview, Green returned home and noticed his 9-millimeter Springfield

5

XD firearm missing. During his second interview on June 12, 2020, Green told police that he previously sold the 9-millimeter Springfield XD firearm. Green admitted that he lied to police to avoid trouble or implicating Richardson.

¶ 16    On cross-examination, Green acknowledged that he told "[a] lot of lies" to police. To Green's knowledge, defendant was never alone in the shared bedroom. Green also acknowledged that he had "no idea what [defendant] was talking about [in the Facebook messages]." Green agreed that the "plan" could have been to rent an Airbnb for Richardson's birthday on June 6, 2020. Green admitted that Shakila told Green to tell police that Richardson never left the house. Green admitted that, if necessary, he would lie to protect Richardson. He, however, testified that he would not lie under oath.

¶ 17    During the June 5, 2020, interview with police, Green admitted that he lied to police multiple times when he stated that he walked outside after he heard gunfire and saw Richardson but not defendant. Green testified that he lied because he "didn't try to place [Richardson] on the scene. I tried to place him with us ***." Sometime after, Green told police that he saw Richardson running away from the car, although Green also testified that he lied about this. Green also admitted that he lied to police when he stated that he owned a Ruger firearm. Police then confronted Green with a magazine and ammunition found in the shared bedroom that matched the ammunition found in and around the victim's car. Green subsequently told police that he sold the firearm. Green admitted that he prefaced his lies to police by stating, "I swear to God," that he was "one hundred percent [telling] the truth," and "I promise." Green never saw Richardson take possession of or hold Green's 9-millimeter Springfield XD firearm. Green admitted that he never saw Richardson move the firearm from Green's backpack, and Green never left it exposed. Green

6

also testified that Richardson messaged him on Facebook to tell him that he "shouldn't have talked to the police about the burner or the heat."

¶ 18    During the June 12, 2020, interview, Green admitted that he put his 9-millimeter Springfield XD firearm in his backpack "way before 9:40 [p.m.]" on June 4, 2020. He placed his backpack in his bedroom, which was the last time he saw the gun. Green admitted that, although he knew the gun was missing prior to the police executing a search warrant, he did not share this information with police to protect himself and Richardson. Green admitted that he told police that he would not have given Richardson his gun "because [he] kn[e]w [Richardson] does dumb stuff," Richardson was "reckless," and "this [was] how [Richardson] acts."

¶ 19    On redirect examination, Green testified that he consistently stated that Richardson and defendant left the home together on June 4, 2020. Green reiterated that defendant sent him Facebook messages "[a] couple of minutes" before defendant and Richardson walked outside. Green acknowledged that he lied about the firearm to avoid getting into trouble with police. Green denied that he had anything to do with the victim's murder.

¶ 20    D. Sergeant Gary Reuter

¶ 21    Sergeant Gary Reuter, an officer assigned to investigations for the Swansea Police Department,[2] testified to the following. Following the shooting on June 4, 2020, Sergeant Reuter reviewed footage from a backyard security camera facing the back driveway of 2569 Madison Avenue. At 10:21 p.m., the camera footage showed two subjects run down the alley. One minute later, Cook ran down the alley. On cross-examination, Sergeant Reuter testified that he did not

---

[2]The record indicates that the Granite City Police Department requested the assistance of the "Major Case Squad," a collection of agencies utilized to pull resources and investigators "from as many as 30 different police departments," to locate the suspects and collect evidence following the shooting.

recall Cook mentioning in his interview that Cook saw the two males "trying to pass something back and forth."

¶ 22    E. Investigator Jesse Fulkerson

¶ 23    Investigator Jesse Fulkerson, a violent crimes investigator with the Cahokia Police Department, testified to the following. On June 4, 2020, Investigator Fulkerson responded to a request for additional assistance to investigate a fatal shooting in Granite City. During the investigation, Investigator Fulkerson located a small bag of "fresh" cannabis in the alleyway behind the crime scene and a black digital scale south of the crime scene in an empty lot in the 2400 block of Madison Avenue. Investigator Fulkerson did not locate a 9-millimeter Springfield XDS firearm. On cross-examination, Investigator Fulkerson testified that he did not know where the cannabis or digital scale came from or how long either item was on the ground.

¶ 24    F. Sergeant Derek Cullen

¶ 25    Sergeant Derek Cullen, a canine officer with the Illinois State Police, testified to the following. Sergeant Cullen and his canine dog were dispatched on June 4, 2020, to assist the Granite City Police Department in apprehending two suspects who fled on foot. Shortly after Sergeant Cullen deployed his canine dog, the canine located a suspect behind a backyard fence between 2515 and 2517 Grand Avenue. Sergeant Cullen gave the suspect verbal warning to show his hands, which prompted the suspect to run. Additional officers subsequently chased the suspect on foot. Shortly thereafter, officers apprehended Richardson. Sergeant Cullen and his canine dog moved back to the "original first place where I saw the suspect." Sergeant Cullen deployed the canine in this area, at which time the canine located a Smith and Wesson "XD .40[-]caliber semiautomatic pistol" near the fence where police apprehended Richardson.

8

¶ 26    G. Master Sergeant Devin Watts

¶ 27    Master Sergeant Watts of the Illinois State Police testified to the following. After Master Sergeant Watts arrived on scene on June 4, 2020, he followed Sergeant Cullen and the canine dog. Master Sergeant Watts found Richardson lying on the side of the house located near 2528 State Street. Richardson had on only one shoe when police apprehended him. Master Sergeant Watts confirmed that another officer discovered a Smith and Wesson firearm on the ground in the corner of the yard where he discovered Richardson.

¶ 28    H. Shawndell Williams

¶ 29    Shawndell Williams, the mother of the victim, testified to the following. The victim drove her car on the night of June 4, 2020. Shawndell confirmed that the Smith and Wesson handgun belonged to the victim. Approximately one to two months after the shooting, police released her car, at which time she discovered a size six-and-a-half black shoe "behind the passenger seat in the rear, in the back on the floor." Williams confirmed that the victim wore a size 11 shoe.

¶ 30    I. Sergeant Nicholaus Roberts

¶ 31    Sergeant Nicholaus Roberts of the Granite City Police Department testified to the following. On June 4, 2020, Sergeant Roberts, assigned to the investigations division, collected Richardson's clothing and shoe. Sergeant Roberts explained gunshot residue, stating that "[w]hen a firearm is fired, the gunpowder ignites and trace amounts of gunpowder come out of the gun and can get on anything around it; hands, clothing, upholstery." At 11:30 p.m. following Richardson's arrest, Sergeant Roberts used "a little machine and sampled both of [Richardson's] hands and put it in the machine to see if it would test for the presence of gunshot residue." Sergeant Roberts confirmed that the machine did not detect the presence of residue on Richardson's hands.

9

¶ 32    Sergeant Roberts also collected the victim's cell phone from the victim's car. Sergeant Roberts also requested access to the Facebook accounts of the victim, Richardson, and defendant. Sergeant Roberts testified that he interviewed Green on June 12, 2020, at which time Green allowed officers to view the content of his Facebook application on his cell phone. During the interview, Green stated that he knew defendant. After Green provided officers with defendant's second Facebook account name, "Nlmb Nikk," Sergeant Roberts obtained Facebook records to this account. A review of the records demonstrated that defendant sent Green several Facebook messages on June 4, 2020, "asking [Green] to come up and look at or check out some type of plan."

¶ 33    On cross-examination, Sergeant Roberts acknowledged that he was not an expert in the science of gunshot residue but had training to use the machine that tested samples for the presence of gunshot residue. Sergeant Roberts did not testify as to the meaning of Richardson's hands testing negative for gunshot residue. Sergeant Roberts acknowledged that he sampled Richardson's hands approximately one hour after the shooting. Sergeant Roberts confirmed that the test did not show whether gunshot residue had been wiped off, affected by the environment, or anything of that nature. He also confirmed that the test only showed "if it detects [gunshot residue] or does not detect it." Sergeant Roberts testified that defendant responded to the State's June 8, 2020, warrant for arrest on June 9, 2020, when defendant presented to the Granite City Police Department with his attorney. On redirect examination, Sergeant Roberts testified that police were actively looking for defendant prior to June 9, 2020.

¶ 34    J. Sergeant Jeff Donahey

¶ 35    Sergeant Jeff Donahey of the Granite City Police Department testified to the following. On June 4, 2020, Sergeant Donahey, assigned to the investigations division as a detective, collected a

.40-caliber Smith and Wesson handgun after police pursued Richardson on foot. During the course of his investigation, Sergeant Donahey determined that this gun belonged to the victim.

¶ 36    K. William Grant Hentze

¶ 37    William Grant Hentze, an experienced crime scene investigator and forensic scientist with the Illinois State Police, testified to the following. The Granite City Police Department contacted Hentze at 11:30 p.m. on June 4, 2020, to process the crime scene at 2569 Madison Avenue. While processing the crime scene, Hentze obtained an empty magazine for a 9-millimeter Springfield Armory XD-S handgun in the dresser of the northwest bedroom at 2569 Madison Avenue. He also discovered two live 9-millimeter cartridges in a shoebox in the same bedroom. Hentze confirmed that he never found the 9-millimeter Springfield XD-S handgun. While processing the victim's car, Hentze discovered two live 9-millimeter cartridges, one discharged cartridge casing on the edge of the floorboard on the rear passenger side, and a fired projectile on the driver's seat.

¶ 38    On cross-examination, Hentze indicated that he preserved, but did not process, the live rounds, discharged round, or magazine for fingerprints. Hentze confirmed that casings usually expel to the right. He, however, agreed that "where you find [the casing] doesn't necessarily mean it just landed and stayed." Hentze admitted that he did not swab the driver's side, passenger side, or door handles for deoxyribonucleic acid (DNA), but he did lift fingerprints from the driver's side door and front passenger side door. Hentze noted that he often made a choice between processing for latent prints or processing for DNA. Hentze acknowledged that he did not recover the black shoe found in the back seat of the victim's car because he did not have reason to believe the shoe was relevant to the investigation. On redirect examination, Hentze clarified that he did not perform fingerprint comparison. Hentze confirmed that the 9-millimeter live rounds could have all been fired from the same 9-millimeter Springfield XD-S handgun.

11

¶ 39    Following a recess, the trial court stated on the record that the parties stipulated that the crime scene investigators collected:

"Two 9 millimeter live ammunition rounds, cartridges collected from the gravel in the driveway of 2569 Madison Avenue; one 9 millimeter cartridge recovered from [the victim's] Kia Sorento; one black bag and its content, which included empty plastic baggies, plastic baggies containing cannabis, a jar containing cannabis, and a bottle of air freshener recovered from [the victim's] person; one Smith and Wesson .40 caliber pistol and its component parts, which included a laser flashlight, a magazine, fifteen .40 caliber cartridges recovered in the grass where *** Richardson hid from police; also collected was one 9 millimeter magazine recovered from the upstairs bedroom of 2569 Madison Avenue; and two 9 millimeter cartridges recovered from the upstairs bedroom of 2569 Madison Avenue; one digital scale *** recovered on the ground of a vacant lot between 2429 and 2435 Madison Avenue; and finally, one plastic baggie with cannabis recovered on the ground in the alley behind 2530 Grand Avenue in Granite City, Illinois."

The parties stipulated that a proper and lawful chain of custody existed. The parties also stipulated that Michael Norbut, a forensic scientist, analyzed all of the above evidence for latent prints. After a thorough analysis, Norbut did not locate any latent prints suitable for comparison. Specifically, Hentze recovered a fingerprint lift from the exterior passenger door of the victim's car and a palmprint lift from the exterior driver's side door of the same vehicle. After Norbut performed a thorough analysis of both lifts recovered from the victim's vehicle, he determined that neither lifted print matched the known samples of the victim, Richardson, or defendant.

¶ 40   L. Brian Hapack

¶ 41   Brian Hapack, a forensic biology DNA analyst with the Illinois State Police, testified to the following. Hapack inspected swabs from the grip of a Smith and Wesson .40-caliber gun to determine if there was "touch DNA" on the gun. Following the swabs, he determined an inconclusive mixture of at least three DNA profiles on the grip of the gun. Hapack confirmed that "touch DNA" generally did not provide "a good source of DNA. It's difficult to recover."

¶ 42   M. Thomas Edward Gamboe Jr.

¶ 43   Thomas Edward Gamboe Jr., a forensic scientist with the Illinois State Police, testified to the following. The parties stipulated to Gamboe as an expert in the "area of firearm, ammunition, tool mark identification and everything to do with guns." Specific to this case, Gamboe examined fired projectiles and bullet casings, testifying that the two fired cartridges— "from outside the car and [the victim's] body"—were fired from the same firearm. He confirmed that the firearm was most likely a Springfield Armory XD firearm. Gamboe testified that, within a reasonable degree of certainty, the victim's Smith and Wesson pistol did not fire either of the two fired cartridge casings or bullets. On cross-examination, Gamboe testified that a Springfield Armory XD firearm most likely ejects cartridge casings to the right. Gamboe confirmed that a casing did not necessarily land to the right but could move around and land in any given space.

¶ 44   N. Dr. Kamal Sabharwal

¶ 45   Dr. Kamal Sabharwal, a medical examiner and expert in the field of forensic pathology, testified to the following. Dr. Sabharwal performed the victim's autopsy, at which time he discovered bruising over the right side of the victim's forehead, as well as abrasions to his nose and right knee. The victim also sustained two gunshot wounds. Dr. Sabharwal testified that one bullet entered on the right side of the victim's chest and exited on the upper part of the victim's

13

back. Specifically, "[t]his gunshot wound tracked *** from right to left. It tracked from front to back and it tracked in a down to up direction." The second bullet entered on the left side of the victim's back. Dr. Sabharwal recovered this bullet from the left side of the victim's chest. Specifically, "[t]his gunshot tracked from back to front" and "it tracked in a frontward direction. It also tracked in an upward direction and also in a rightward direction." Dr. Sabharwal testified that "stippling" occurred only around this entrance wound, which indicated the shooter shot the gun in close range to the victim's body. Dr. Sabharwal could not determine the order of the gunshot wounds but testified that both gunshot wounds were fatal.

¶ 46    On cross-examination, Dr. Sabharwal testified that the wound in the back had stippling from an intermediate range, which typically caused a wound from the range of approximately 2 to 24 inches. Dr. Sabharwal confirmed, however, that stippling can occur "sometimes four to five feet." Dr. Sabharwal testified that the bullet that entered on the right side of the victim did not cause stippling, which could mean the shooter fired from more than 24 inches or the victim's clothing covered the affected part of the victim's body. On redirect examination, Dr. Sabharwal confirmed that he did not know the position of the victim's body at the time of the shooting.

¶ 47    O. Deandre Richardson

¶ 48    Richardson, defendant's codefendant, testified to the following. Richardson testified that he was right-handed. He acknowledged that he pled guilty to the first degree murder of the victim in exchange for 20 years in prison. The State moved to admit, and the trial court admitted into evidence, Richardson's witness agreement, which required him to testify truthfully and consistently with the statements he made to police on August 3, 2022.

¶ 49    On June 4, 2020, Richardson and defendant went upstairs to Richardson's bedroom, while Richardson's family remained downstairs. Richardson knew that Green left his gun in his

14

backpack in their bedroom. Richardson removed the gun from the backpack and placed it in a dresser drawer. Richardson testified that he left defendant in his bedroom alone at some point when Richardson used the bathroom. According to Richardson, defendant knew Green had a gun, and Richardson saw defendant with the gun before. After defendant came over, Richardson, admittedly mad at the victim, decided to rob the victim—a high school classmate of both men—with defendant. Richardson agreed that he "share[d] [his] idea to rob [the victim] with *** defendant," and defendant agreed to participate. Defendant and Richardson purchased marijuana from the victim in the past.

¶ 50    Richardson's plan entailed defendant texting the victim to buy marijuana and then rob the victim. Richardson would grab the victim from behind, while defendant took the marijuana. When defendant and Richardson saw the victim in the back alley, they walked outside. They found the victim weighing marijuana on a scale in his vehicle. Defendant entered the vehicle and sat in the front passenger seat, while Richardson entered from the rear passenger's side. After Richardson entered the vehicle, he grabbed the victim from behind. When the victim fought back, Richardson saw defendant shoot the victim. According to Richardson, defendant shot the victim from outside the car.

¶ 51    Richardson admitted that he did not inform police on August 3, 2022, that he saw defendant shoot the victim. He later informed the State of his observation while preparing for trial. Richardson agreed that he informed the State that defendant shot the victim after he finalized his plea deal. Richardson also admitted that he did not tell police that defendant shot the victim because "[he] was trying to protect him." Richardson further testified that the victim fought him after defendant shot him once. While Richardson and the victim struggled, the victim reached for his gun in his waistband, and Richardson heard a second gunshot. Richardson grabbed the victim's

15

gun and then "jump[ed] out of the car and r[a]n." Richardson denied that he shot the victim. Richardson testified that defendant shot the victim. Initially, Richardson and defendant ran together, turning left out of the back driveway into the alley towards 25th Street. At some point, however, the two men split up. Richardson testified that he never tried to blame defendant for shooting the victim. Instead, he accepted responsibility for his actions.

¶ 52 On cross-examination, Richardson testified that he spoke to police for the first time on August 3, 2022, with the witness agreement in front of him. Richardson admitted that, before the State presented him with the witness agreement, the State offered him an agreement for a "free talk" interview. Richardson admitted that the purpose of the "free talk" interview included implicating defendant in exchange for a 20-year prison sentence. Richardson acknowledged that he faced a possible 40-year prison sentence if he went to trial.

¶ 53 Richardson testified that he reviewed his August 3, 2022, interview the day before his testimony. Richardson told police that he concocted the plan to rob the victim because he "had a problem with [the victim]." Richardson also admitted that defendant did not have a problem with the victim. Richardson admitted that he did not implicate defendant when he first spoke to police but stated the plan to rob the victim was his plan. Richardson recalled stating to police that he did not share his plan with anybody. He testified, however, that he only shared the plan with defendant and no one else. Richardson acknowledged that his birthday was on June 6, and the men were planning a birthday event at an Airbnb. Richardson stated that, prior to the shooting, he did not know that defendant messaged Green on Facebook.

¶ 54 Specific to June 4, 2020, Richardson testified, again, that he, not defendant, had a problem with the victim. Defendant entered the victim's car and sat in the front passenger seat, and Richardson entered from the rear passenger seat. Once inside the car, Richardson "scooted over to

16

the middle" seat behind the victim. Several seconds later, as the victim asked if the men had the Cash App to pay for the marijuana, Richardson grabbed the victim from behind. Richardson admitted that he told police that no words were exchanged when he grabbed the victim. Richardson testified that, as he grabbed the victim and they wrestled, he noticed that the victim had a black gun. Richardson denied that he struck the victim on the head. As soon as Richardson and the victim started to wrestle, defendant got out of the car but did not run away.

¶ 55    Richardson saw defendant with a gun when he shot the victim after he "jumped out" of the car. Richardson could not remember defendant's location when defendant shot the victim. Richardson admitted that he told police he "[was] too focused on wrestling with [the victim] to see what [defendant] was doing." Richardson testified that he saw defendant run around the car from the passenger side to the driver's side, but he did not see defendant open the driver's side door.

¶ 56    Richardson admitted that he changed his story prior to trial on September 23, 2022, when he spoke to the State. At that time, he informed the State that he "saw [defendant] shoot the first shot [from the front passenger seat] and then [defendant] walked around the car and [Richardson] heard the second shot." Richardson clarified that he heard the first shot as he wrestled the victim, and then he saw defendant walk around the car to the driver's side. Richardson then heard the second shot. Richardson could not recall whether the driver's side window was open. He testified that the driver's side door was "obviously open," although he did not see it open. Richardson testified that he was not aware that the driver's side door was found closed. Richardson admitted that he did not see defendant take a gun out of his bedroom. Richardson also did not see defendant with a gun the entire night before the shooting. Richardson denied that he and defendant spoke about a gun that night. Richardson testified that he removed Green's gun from his backpack after Green returned home from playing basketball. However, Richardson admitted that he told police

17

that he removed Green's gun from his backpack before Green went to play basketball. After refreshing his recollection from the police interview, Richardson testified that he removed Green's gun from his backpack before Green played basketball and placed the gun in a dresser drawer in his bedroom.

¶ 57     Richardson admitted that he wrestled the gun away from the victim. Richardson did not see defendant take the victim's marijuana or scale. Richardson then admitted that he repeatedly told police in the "free talk" interview that he never saw defendant shoot the victim. Richardson also acknowledged that he took a break during the "free talk" interview to talk to his attorney.[3] Richardson admitted that he changed his story after he met with his attorney to say that he and defendant had a plan, Richardson did not see defendant shoot the victim, but Richardson heard defendant shoot the gun. Sometime after, another break took place, and Richardson consulted with his attorney again. Following the break, Richardson's attorney questioned him in front of police. Richardson then stated for the first time that Richardson saw a gun. Richardson proceeded to state that he heard the first gunshot, saw defendant's face, and then saw defendant holding a gun. Richardson admitted that the "second to last thing that [he] said after [his] lawyer left [was], I saw [defendant] shoot [the victim]." Richardson also stated that defendant had a white bag where he kept the gun. Richardson also testified that he told police that Green came to the shared bedroom after defendant arrived at the house on June 4, 2020, to "chill[ ]." Richardson testified that he lied to police. Richardson acknowledged that he told police that he believed the firearm that killed the victim belonged to Green.

---

[3]The report of proceedings demonstrates that a side bar took place in the hallway concerning defense counsel's questions of Richardson's August 3, 2022, "free talk" interview. The trial court ruled that defense counsel could cross-examine Richardson that he changed his statements to police after meeting with his attorney. The court denied defense counsel's request to address the "exact statements" of Richardson's attorney that were recorded, although inaudible at times, while consulting with Richardson.

¶ 58    Richardson acknowledged that when he agreed to the "free talk" interview, he understood that the State had evidence against him, including Richardson's shoe in the victim's car, that Richardson possessed the victim's gun following the shooting, that police found live ammunition in the shared bedroom that matched the type of gun owned by Green, and that Richardson ran from police following the shooting. On redirect examination, Richardson testified that he initially lied to police that he did not see defendant shoot the victim to protect defendant.

¶ 59    P. Sergeant Carter Burford

¶ 60    Sergeant Carter Burford of the Granite City Police Department testified to the following. Defendant presented to the Granite City Police Department with his attorney on June 9, 2020, with a drastically different appearance and what appeared to be fresh hair clippings on his clothing and shoes.

¶ 61    Q. Detective Michelle Werner

¶ 62    Detective Michelle Werner of the Granite City Police Department testified to the following. Detective Werner obtained Green's Facebook information, which showed that Green and defendant exchanged Facebook messages prior to the shooting. Specifically, on June 4, 2020, at 10:07:33 p.m., defendant asked Green to come to Green and Richardson's bedroom. At 10:07:52 p.m., Green stated, "damn, that's far. What's up." Defendant replied to Green at 10:08:11 p.m. stating. "Listen to the plan. Let us know if this [is] good." Green then stated that he would come to the shared bedroom. At 10:13:23 p.m., defendant messaged Green again, stating: "aye, come here, come." Defendant then called Green at 10:15:18 p.m. Detective Werner testified that the 9-1-1 call took place seven minutes later on 10:22 p.m. Detective Werner also testified that she recovered photos from the victim's Facebook profile that showed an image of marijuana, dated June 4, 2020, and an image of the victim holding a large stack of cash, dated June 2, 2020.

19

Detective Werner testified that Richardson and defendant viewed both of these posted images on the victim's Facebook profile.

¶ 63    On cross-examination, Detective Werner testified that she did not know that Green, Richardson, and defendant had plans to celebrate Richardson's birthday on June 6, 2020. Detective Werner acknowledged that she obtained Richardson's Facebook name but did not search or inquire into any of his social media information, noting that she "did not have probable cause to do a search of his social media records."

¶ 64    R. Detective Brandon Shellenberg

¶ 65    Detective Brandon Shellenberg of the Granite City Police Department testified to the following. On June 5, 2020, Detective Shellenberg executed a search warrant on defendant's home. Defendant's mother provided Detective Shellenberg access to her home security cameras; however, no camera footage of June 4, 2020, existed. Detective Shellenberg testified that defendant's mother "stated that all of her evidence was gone" from June 4, 2020.

¶ 66    Police obtained a search warrant for defendant's Facebook account. Detective Shellenberg testified that defendant messaged a Facebook user called "Ream JaShawn" from his Facebook account, "NLMB Nick," on June 2, 2020, stating: "umm shit, lemme see because I know Dono got that two tone XD. I'm finna see is he tryna sell it." Detective Shellenberg testified that defendant's message indicated that defendant had knowledge of Green's 9-millimeter Springfield XD. The State then showed Detective Shellenberg the Facebook messages between defendant and Green on June 4, 2020, from 10:07 p.m. to 10:15 p.m. Detective Shellenberg testified that he did not find these specific messages when he searched defendant's Facebook. Detective Shellenberg found other Facebook messages that defendant engaged in before and after the shooting. On cross-

examination, Detective Shellenberg confirmed that he did not apply for a search warrant for any records related to Richardson's social media accounts.

¶ 67    S. Sergeant Jeff Donahey

¶ 68    Sergeant Jeff Donahey, an expert in cellular forensics and historical cell site analysis, testified to the following. Sergeant Donahey received defendant's phone number from defendant's mother on June 6, 2020, prompting police to apply for, and receive, a "pen register trap and trace order" for defendant's phone number. When police attempted to trace defendant's cell phone, they discovered his phone "never active on the network when we started the pen trap trace." In his expert opinion, Sergeant Donahey found it unusual for an individual to have their phone turned off or in airplane mode for a long period of time.

¶ 69    Sergeant Donahey testified that cell tower records showed defendant's cell phone active in the cell phone network of 2569 Madison Avenue at 10:17:08 p.m. on June 4, 2020. At 10:22:04 p.m., cell tower records showed defendant's cell phone active in the same area. At 10:46:45 p.m. on June 4, 2020, the cell tower records showed that defendant's cell phone moved to an area south of 2569 Madison Avenue, which suggested defendant moved south. Sergeant Donahey testified that defendant made multiple calls to his aunt, Felicia Ware, between 10:22 p.m. and 10:35 p.m., with one call lasting approximately four minutes long. Ware lived south of 2569 Madison Avenue in Madison, Illinois. Sergeant Donahey testified that, based on cell tower records, defendant's cell phone "[was] heading in the direction of his aunt's house after th[e] murder." Sergeant Donahey also viewed the victim's phone records, including his Snapchat. On June 4, 2020, defendant and the victim messaged via Snapchat. At 10:16 p.m., the victim messaged defendant, "Hurry up foo foo." The victim did not communicate with another person following this message.

¶ 70    Following Sergeant Donahey's testimony, the State, outside the presence of the jury, stated that it "would rest, subject to the admission of its exhibits." Defense counsel then moved for a directed verdict, which the trial court denied. The court confirmed that the State rested, subject to the admission of its evidence.[4] Following the trial court's denial, defense counsel requested to call Thomas Gamboe as an expert witness in gunshot residue. The State immediately responded that Gamboe, who testified the day before, "wasn't disclosed to us as an expert." The State proceeded to argue:

> "There was no disclosure [by defense counsel] of the testimony that [Gamboe] would be expected to be giving. I've been provided with no expected testimony or any reports from him. Further, I don't believe he is a trace chemist for gunshot residue on hands. I know he does do gunshot residue patterns on clothing to determine distance. But that would be my objections."

In response, defense counsel argued that the court certified Gamboe as an expert. The trial court clarified that it certified Gamboe as an expert in the field of ammunition, firearms, and tool mark identification. The trial court further stated, "It's a surprise. [Gamboe] was called by the State in firearm, firearm ammunition. There was no discussion about gunpowder or gunpowder residue. None of those questions were asked by the State, nor you." The court stated the following:

> "If the State discloses someone as an expert in a particular field, they don't get to blind side the defense by then also asking them about another area of expertise that they didn't disclose to you. All of the reports that they supplied dealt with firearms and firearm ammunition and identification. They supplied you [defense counsel] with Detective

---

[4]The docket entry for October 6, 2022, indicated that both the State and defense rested.

Roberts's report regarding the gunshot residue. Was there anything in the reports supplied by forensic scientist Gamboe regarding gunshot residue?"

The State stated no. Defense counsel then agreed that he did not disclose to the State that he would call Gamboe as an expert in gunshot residue, stating: "I didn't think I had to." The court followed up by stating, "The law says you're supposed to disclose someone as an expert." Defense counsel responded: "That's fine. The Court can make it[ ]s ruling. I'll make my offer of proof and move on."

¶ 71 Following a short recess, the trial court, again, addressed defense counsel's request to call Gamboe as an expert in gunshot residue. The court stated the following:

"I do not find that the State was given sufficient notice to be able to prepare. The reports that the State supplied all dealt with firearm and tool marks and identification. And those were all supplied to the defense well in advance, as was the gunshot residue report that Detective Roberts testified about. If the defense wanted to call Mr. Gamboe as an expert on the issue of gunshot residue, then they needed to supply the State with that information so that if they wanted to find their own expert to counteract Mr. Gamboe, they could. And they weren't given that, because they weren't told that he was going to be called to testify to that until today. So I find that they were not given sufficient notice, and I am not allowing you to question Mr. Gamboe regarding that particular issue. If there's other things gun related, that's fine. But if it's regarding that particular issue, I will not allow that."

The court also denied defense counsel's request to call Gamboe to ask questions with respect to stippling, a form of gunshot residue, with respect to particles on clothing and things of that nature. The court stated that the State "would rest in the morning officially, and then the defense would

23

indicate they're not presenting any witnesses and we would go into closing arguments." The judge then released the jury for the day.

¶ 72   Defense counsel then made an offer of proof, outside the presence of the jury, through the testimony of Gamboe. Gamboe testified to the following. Defense counsel asked Gamboe if his expertise included the area of gunshot residue. Gamboe testified:

> "Well, there are two areas. One is where we examine gunshot residue in order to do a muzzle to target distance determination. That is my area of expertise. The other is the elemental analysis of gunshot residue to determine whether or not it's various components of gunshot residue, including gunpowder. I have what you call a working familiarity with that. I'm not an expert in that."

Gamboe testified that the lab he worked for continued "to do gunshot residue." According to Gamboe, however, gunshot residue "[was] very open to interpretation" and "nearly useless." In Gamboe's opinion, the absence of gunshot residue on an individual's hands did not necessarily indicate that the individual did not fire a firearm. To the best of his knowledge, the Federal Bureau of Investigation (FBI) discontinued the use of gunshot residue. Following the offer of proof, the trial court stated: "I feel even better about the decision that I made to not allow Mr. Gamboe to testify," noting, again, that defense counsel did not provide the State sufficient notice. The court stated the following:

> "Because as testifying as an expert as to that issue and to have that testimony without giving the State the opportunity to have had—they could have contacted the forensic science lab in Chicago to see if they would have had an expert to testify that might have felt differently about it. To not give the State that opportunity is simply why we have the discovery rules,

24

why we have Supreme Court Rule[s] 412 and 413. So with that, I will not allow him to testify as to those particular issues."

The court denied defense counsel's request to call Gamboe to testify.

¶ 73    The next day, on October 7, 2022, the State formally rested in the presence of the jury. The defense then rested without presenting evidence. The parties proceeded to closing arguments. Following closing arguments, the trial court instructed the jury of the law, stating the following:

"To sustain the charge of First Degree Murder, it is not necessary for the State to show that it was or may have been the original intent of the defendant, or one for whose conduct he is legally responsible, to kill the deceased Sean Williams. It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant, and one for whose conduct he is legally responsible, combined to do an unlawful act, such as commit armed robbery. And that the deceased was killed by one of the parties committing that unlawful act.

A person who is legally responsible for the conduct of another person may be convicted for an offense committed by the other person even though the other person, who it is claimed committed the offense, has not been convicted."

The court proceeded to instruct the jury:

"To sustain the charge of First Degree Murder[,] the State must prove the following propositions: First proposition, that the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Sean Williams; and second proposition, that when the defendant, or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm to Sean Williams, or he knew that his

25

acts created a strong probability of death or great bodily harm to Sean Williams, or he was committing the offense of armed robbery.

\*\*\*

A person commits the offense of Armed Robbery when he, while carrying on or about his person or is otherwise armed with a firearm, knowingly takes property from the person or presence of another by the use of force or by threatening the imminent use of force.

To sustain the charge of Armed Robbery[,] the State must prove the following propositions: That the defendant, or one for whose conduct he is legally responsible, knowingly took property from the person or presence of Sean Williams; and second proposition, that the defendant, or one for whose conduct he is legally responsible, did so by the use of force or threatening the imminent use of force; and third proposition, that the defendant, or one for whose conduct he is legally responsible, carried on or about his person or was otherwise armed with a firearm at the time of the taking."

Following deliberations, the jury found defendant guilty of first degree murder and armed robbery. The jury signed a general verdict form, which did not require them to specify the basis of their verdict. The trial court's docket entry on October 7, 2022, indicated that counts II and III merged with count I.

¶ 74    On October 28, 2022, defendant filed a timely posttrial motion, arguing that the State failed to prove defendant guilty of first degree murder and armed robbery beyond a reasonable doubt. Defendant also asserted that the trial court erred by denying defense counsel the ability to call Gamboe as an expert witness on gunshot residue.

¶ 75    On January 19, 2023, the trial court heard argument on defendant's posttrial motion and subsequently denied his motion. The court then sentenced defendant to 32 years in prison followed by 3 years of MSR. Defendant filed a timely notice of appeal, and this appeal followed.

¶ 76                                    II. Analysis

¶ 77    Defendant argues on appeal that the State failed to prove beyond a reasonable doubt that he committed first degree murder and armed robbery. Specifically, defendant claims that the State's evidence fell short of proving him guilty beyond a reasonable doubt that he personally shot the victim or was accountable for the murder or armed robbery of the victim, where his conviction was based on the unbelievable and self-serving testimony of Richardson. Defendant also argues that the trial court erred, and alternatively, the court abused its discretion, by barring defense counsel from calling Gamboe, the State's expert in the areas of firearm, ammunition, and tool mark identification. In response, the State contends that the evidence, viewed in the light most favorable to the State, more than sufficiently proved defendant guilty of both offenses. In addition, the State argues that the trial court did not err by barring Gamboe from testifying as a gunshot residue expert, where the State did not certify Gamboe as an expert in gunshot residue, and defense counsel did not provide notice to the State of his intention to call Gamboe as an expert in gunshot residue. As such, the State contends that the court did not abuse its discretion. We agree with the State.

¶ 78    The critical inquiry on review of a sufficiency of the evidence claim is whether, after reviewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). On review, all of the evidence is considered in the light most favorable to the prosecution. *People v. Furby*, 138 Ill. 2d 434, 455 (1990) (citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). It is the jury's responsibility to determine the witnesses'

27

credibility and the weight to be given to their testimony, to resolve conflicts of evidence, and to draw reasonable inferences from the evidence. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). We, thus, will not substitute our judgment for that of jury on these matters. *Id.* We will not set aside a conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *People. v. Cox*, 195 Ill. 2d 378, 387 (2001).

¶ 79    In the case at bar, the jury issued a general verdict, which did not explain its basis for the first degree murder conviction. Our supreme court has held that "[w]hen there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory." *Witherell v. Weimer*, 118 Ill. 2d 321, 329 (1987). Since we find sufficient evidence existed for a reasonable jury to enter a conviction based on the theory of accountability, we find it unnecessary to discuss other theories.

¶ 80    In Illinois, to convict a defendant under the theory of accountability, the State must prove beyond a reasonable doubt that the defendant (1) solicited, aided, abetted, agreed, or attempted to aid another person in the planning or commission of the offense; (2) participated as such before or during the commission of the offense; and (3) had the concurrent, specific intent to promote or facilitate the commission of the offense. 720 ILCS 5/5-2(c) (West 2020). Thus, to prove that a defendant possessed the intent to promote or facilitate the crime, the State may present evidence that either the defendant shared the criminal intent of the principal or a common criminal design existed. *People v. Fernandez*, 2014 IL 115527, ¶ 13. "Under the common-design rule, if 'two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.' " *Id.* (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)).

28

¶ 81    Defendant argues that no rational trier of fact could find him accountable beyond a reasonable doubt for the offenses at issue, where the only evidence that defendant shared a common purpose with Richardson came from Richardson's own "inherently unbelievable story." There is no question that the State's critical evidence linking defendant to the murder included Richardson's testimony. Moreover, there is no question that Richardson changed his story multiple times. Specifically, on August 3, 2022, during a "free talk" interview, Richardson initially told detectives that he did not see defendant holding a gun or that he saw defendant shoot the victim on June 4, 2020. After detectives left the room, Richardson spoke with his attorney. Richardson then changed his story, informing detectives that he heard defendant shoot the victim. Defendant, again, met with his attorney outside the presence of detectives. Richardson then stated that he saw defendant holding a gun on June 4, 2020. Although Richardson testified on direct examination that he told the State for the first time on September 23, 2022, that defendant shot the victim, the record indicates that Richardson admitted on cross-examination that he stated to detectives during his "free talk" interview on August 3, 2022, "after [his] lawyer left, *** [that he] saw [defendant] shoot [the victim]."

¶ 82    We recognize that the testimony of an accomplice witness has inherent weaknesses and should be accepted only with caution and suspicion. *People v. Tenney*, 205 Ill. 2d 411, 429 (2002). Nevertheless, the testimony of an accomplice witness, whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt. *Id.* (citing *People v. Smith*, 177 Ill. 2d 53, 74 (1997)). The jury knew Richardson entered into a plea deal with the State, which required him to testify truthfully and consistently with his statements to police on August 3, 2022. The trial court also instructed the jury that accomplice testimony was subject to suspicion and, therefore, should be viewed with

caution. See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000). In addition, the jury heard Richardson's testimony and was made well aware of his prior inconsistent statements regarding defendant's actions on the evening of June 4, 2020. It was the jury's function to draw conclusions based on the evidence and to decide whether there was a reasonable doubt as to defendant's guilt. See *People v. Bull*, 185 Ill. 2d 179, 204-05 (1998); *People v. Young*, 128 Ill. 2d 1, 51 (1989) ("It is the function of the jury as the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence.").

¶ 83     Contrary to defendant's argument that the State's "other evidence established at most that [defendant] was present in the vehicle at the time of the shooting," sufficient evidence existed that defendant voluntarily attached himself to an individual " 'bent on illegal acts with knowledge of its design[, which] supports an inference that [defendant] shared the common purpose.' " *Fernandez*, 2014 IL 115527, ¶ 13 (quoting *In re W.C.*, 167 Ill. 2d at 338). Specifically, the evidence demonstrated that defendant arrived at Richardson's home around 10 p.m. on June 4, 2020. Defendant immediately went to the upstairs bedroom shared by Green and Richardson to meet Richardson. Richardson consistently stated multiple times that he concocted a plan to rob the victim because he "had a problem with [the victim]." Richardson shared his plan with defendant that he would enter the rear passenger side of the victim's car and grab the victim from behind, while defendant robbed the victim, a known drug dealer, of his marijuana.

¶ 84     After arriving to Richardson's home, defendant, not Richardson, messaged Green via Facebook at approximately 10:08 p.m., requesting Green to come to the bedroom to listen to a "plan," stating: "Let us know if this [is] good." When Green did not comply, defendant messaged Green again asking Green to "come, here, come." When Green did not comply, defendant called

30

Green at approximately 10:15 p.m., requesting Green to come upstairs. Green did not comply. One minute later, at 10:16 p.m., the victim messaged defendant, "Hurry up foo foo [*sic*]." Defendant argues on appeal, similar to his trial strategy, that defendant messaged Green for a non-criminal reason, that is, to plan Richardson's birthday celebration at an Airbnb on June 6, 2020. As such, defendant asserts that he merely sent "ambiguous *** messages" to Green. However, a rational jury could infer from the short timeframe between defendant's call and Facebook messages to Green to the death of the victim that defendant and Richardson intended to carry out Richardson's plan. See *Young*, 128 Ill. 2d at 51 ("It is the function of the jury as the trier of fact to assess *** the inferences to be drawn from the evidence."). Moreover, even if Richardson concocted the plan, defendant's actions of luring the victim to Richardson's home under the guise of buying marijuana demonstrates that defendant aided Richardson in planning the robbery. In addition, the evidence demonstrates that defendant facilitated Richardson's plan and at least participated before the commission of the armed robbery.

¶ 85    Moreover, shortly after defendant contacted the victim at 10:16 p.m., defendant and Richardson exited the home through the back door to meet with the victim in his car in the back alley. When leaving the home, Green testified that defendant and Richardson walked past Green, Richardson's mother, and Richardson's two brothers. Upon entering the victim's car, Richardson testified that he entered the rear passenger area, while defendant entered the front passenger seat. Almost immediately, Richardson forcefully grabbed the victim from behind, and the two started to wrestle. Importantly, police apprehended Richardson following the shooting. At that time, Richardson, wearing only one shoe, possessed the victim's Smith and Wesson firearm. Police later recovered Richardson's black, size six-and-a-half shoe wedged in the backs eat of the victim's car. Thus, this evidence corroborated Richardson's testimony that he entered the back seat of the

victim's car on the evening of June 4, 2020. Moreover, the evidence demonstrated that the passenger side door was open, which corroborated Richardson's testimony that defendant entered the front passenger seat of the victim's car.

¶ 86     Additionally, the State's evidence demonstrated that defendant had knowledge that Green possessed a "two tone XD" firearm prior to the shooting. The State presented detailed evidence that the gun used in the shooting was a 9-millimeter Springfield XD, which matched the magazine police later found in a dresser drawer in Green and Richardson's shared bedroom. Next, Sergeant Roberts confirmed that Richardson's hands testified negative for gunpowder residue approximately one hour after the shooting, although Sergeant Roberts did not explain the negative test result. Moreover, defendant fled south of the crime scene following the shooting. Evidence demonstrated that police recovered a small bag of "fresh" cannabis in the alleyway behind the crime scene, as well as the victim's black scale south of the crime scene, where cell phone records indicated defendant's presence. The evidence also demonstrated that defendant continued south following the shooting in the direction of his aunt's house. Importantly, police apprehended Richardson north, not south, of the scale at 2517 Grand Avenue.

¶ 87     The fact of the matter is that either Richardson or defendant carried a gun with them to the victim's car to commit a crime, which resulted in the victim's death. It is undisputed that defendant was present in and around the victim's car at the time of the shooting, and the victim's gun, a Smith and Wesson, was not the weapon used to facilitate the murder. The evidence supports the conclusion that the men armed themselves and lured the victim to the residence for the purpose of robbing the victim. At some point during the interaction with the victim, the men removed a black scale, a small bag of "fresh" cannabis, and the victim's Smith and Wesson firearm from the victim's car. Even if defendant was surprised by the shooting, as he claims on appeal, the evidence

32

demonstrates that he entered into a common design with Richardson to commit a robbery. Our supreme court has recognized that "[w]here there is a common design to do an unlawful act, then 'whatever act any one of them [does] in furtherance of the common design is the act of all, and all are equally guilty of whatever crime was committed.' " *People v. Nelson*, 2017 IL 120198, ¶ 40 (quoting *People v. Tarver*, 381 Ill. 411, 416 (1942)). The case at bar demonstrates a scenario where "[a] shot fired by one of the defendants, under the circumstances shown, was a shot fired by all and all of them must answer for the result." *Tarver*, 381 Ill. at 415-16. Accordingly, we cannot conclude that the State failed to prove defendant guilty beyond a reasonable doubt of first degree murder and armed robbery under the theory of accountability.

¶ 88    Defendant next contends that the trial court erred by excluding the testimony of Gamboe as a sanction for a violation of the discovery rules, where Gamboe, the State's firearm expert, would have answered questions about gunshot residue and provided context for the negative test result on Richardson's hands. Before considering the appropriateness of a sanction imposed by the trial court, a threshold question must be answered—whether the defense committed a discovery violation. *People v. Hood*, 213 Ill. 2d 244, 256 (2004).

¶ 89    In Illinois, discovery rules are set in place to " 'prevent surprise or unfair advantage [to either party] and to aid in the search for the truth.' " *People v. Sims*, 374 Ill. App. 3d 231, 259-60 (2007) (quoting *People v. Daniels*, 75 Ill. App. 3d 35, 41 (1979)). Specifically, pursuant to Illinois Supreme Court Rule 413(c), a defendant must furnish the State with a list of witnesses it intends to call, including a statement of the qualifications of expert witnesses, and allow the State to inspect " 'any reports or results, or testimony relative thereto,' " which it has in its control or possession. *Id.* at 260 (quoting Ill. S. Ct. R. 413(c) (eff. July 1, 1982)). Where, as here, the facts giving rise to

33

the alleged discovery violation are not in dispute, the question is one of law that we review *de novo.* *Hood*, 213 Ill. 2d at 256.

¶ 90    Despite the fact that defense counsel listed Gamboe as a potential defense witness, defense counsel never informed the State or trial court that he intended to elicit expert testimony from Gamboe regarding gunshot residue until after the State verbalized its intent to rest, subject to admission of its exhibits, and defense counsel moved for a directed verdict. Following the State's objection, defense counsel argued that the trial court previously certified Gamboe as an expert. The court clarified that the parties stipulated to Gamboe as an expert in the "area of firearm, ammunition, tool mark identification and everything to do with guns." The court further stated that neither party asked Gamboe any questions or engaged in any "discussion about gunpowder or gunpowder residue." Moreover, defense counsel agreed that Gamboe's reports did not provide information regarding gunshot residue. Defense counsel, a seasoned attorney, did not disclose Gamboe as an expert in the field of gunshot residue, stating: "I didn't think I had to." The trial court subsequently denied defendant's request to certify Gamboe as an expert in gunshot residue.

¶ 91    Defendant argues, however, that the State was aware that Gamboe was a potential defense witness with expertise in gunshot residue training from the Federal Bureau of Investigation Academy. However, the State argued the following on the record when objecting to defense counsel calling Gamboe as an expert: "I don't believe [Gamboe] is a trace chemist for gunshot residue on hands." The State knew, however, that Gamboe "do[es] gunshot residue patterns on clothing to determine distance." The State's knowledge of Gamboe's experience was consistent with Gamboe's testimony, where he stated that he had expertise in examining gunshot residue to determine muzzle to target distance but only a "working familiarity" of, not an expertise in, "elemental analysis" to detect components of gunshot residue, including gunpowder, following a

34

shooting. Defendant argues on appeal that the purpose of Gamboe's testimony was to show that, based on his expertise in the area of muzzle to target distance, the negative gunshot residue result "did not mean [Richardson] could not have fired the gun."

¶ 92 Defendant further argues that Gamboe's testimony "was not needed in that second category," that is, elemental analysis of gunshot residue. However, importantly, defendant provided this court with no reasoning to support his conclusory statements, especially provided that Gamboe's curriculum vitae (CV) demonstrates that he provided expert testimony related to receiving and examining various items of physical evidence related to "firearm, toolmark, footwear, and tire track identification," not an expertise in gunshot residue. We, thus, cannot agree that Gamboe's additional training listed on his CV established him as an expert in gunshot residue, or that the State should have been aware that defense counsel would call Gamboe as an expert in this area to undermine the use of gunshot residue testing and to show that, despite the fact that Richardson's hands were free of components of gunshot residue, the test did not prove Richardson did not fire the gun. In sum, we conclude that the trial court properly ruled that the defense failed to disclose Gamboe as an expert witness in gunshot reside to prevent surprise on the part of the State. We now turn to the question of the proper sanction for this discovery violation.

¶ 93 Defendant next argues that the trial court abused its discretion when it excluded all of Gamboe's testimony regarding gunshot residue. When a party fails to comply with an applicable discovery rule, the circuit court " 'may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances.' " *People v. Johnson*, 262 Ill. App. 3d 781, 788 (1994) (quoting Ill. S. Ct. R 415(g)(i) (adopted Oct. 1, 1971)). The decision as to the severity of the sanction to impose on a party who violates discovery rules rests within the sound discretion

35

of the trial court and will not be lightly overturned. *People v. Osborne*, 114 Ill. App. 3d 433, 437 (1983).

¶ 94    As stated above, the purpose of the discovery rules is to " 'prevent surprise or unfair advantage [to either party] and to aid in the search for the truth.' " *Sims*, 374 Ill. App. 3d at 259-60 (quoting *Daniels*, 75 Ill. App. 3d at 41). The purpose of sanctions is to further the purpose of discovery rules, not to punish the offending party. *People v. Scott*, 339 Ill. App. 3d 565, 572 (2003). This rule is balanced against the principle that few rights are more fundamental than that of an accused to present witnesses in his own defense. *People v. Whalen*, 238 Ill. App. 3d 994, 998 (1992). "The exclusion of evidence is a drastic measure[,] *** applica[ble] to flagrant violations, where the uncooperative party demonstrates a 'deliberate contumacious or unwarranted disregard of the court's authority.' " *People v. Rayford*, 43 Ill. App. 3d 283, 286 (1976) (quoting *Schwartz v. Moats*, 3 Ill. App. 3d 596, 599 (1971)).

¶ 95    However, the Supreme Court rejected the argument that preclusion of evidence is never a permissible sanction for a discovery violation, stating:

> "[I]t is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case. It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests." *Taylor v. Illinois*, 484 U.S. 400, 414 (1988).

Prohibiting a criminal defendant from presenting testimony or evidence as a discovery sanction is a disfavored sanction because it does not further the goal or truth seeking. *People v. Tally*, 2014 IL App (5th) 120349, ¶ 28. Nevertheless, the principal reason for notice rules is prevention of

36

surprise to the opposing party. *Whalen*, 238 Ill. App. 3d at 999. Other factors considered before a trial court excludes evidence includes the effectiveness of a less severe sanction, the materiality of the witness's proposed testimony to the outcome of the case, the prejudice to the other party by the testimony, and the evidence of bad faith in the violation of the discovery rules. *Tally*, 2014 IL App (5th) 120349, ¶ 29. In evaluating whether the court abused its discretion, we " 'consider these factors in the context of the factual circumstances of [the] case.' " *Id.* (quoting *Scott*, 339 Ill. App. 3d at 573). When the exclusion of evidence is employed by the trial court, that decision will be closely scrutinized on appeal. *People v. Echols*, 146 Ill. App. 3d 965, 972 (1986).

¶ 96    Defendant contends that the exclusion of Gamboe's testimony was too harsh a sanction. Defendant argues that defense counsel sought to offer important, but brief, testimony, thus, a recess or continuance offered a more appropriate consideration than exclusion of Gamboe's testimony. We note that defense counsel never requested or proposed a continuance to allow the State time to prepare. However, now, on appeal, defendant asserts that the court should have afforded the State time to interview Gamboe without causing undue delay to defendant's trial, given the court entered a continuance to the next day, and "Gamboe was present in the courthouse and available to the State." We find this argument unpersuasive and speculative.

¶ 97    The record indicates that the trial court took a short recess at 3:20 p.m. on October 6, 2022, the fourth day of defendant's jury trial, following the testimony of Sergeant Donahey, the State's final witness. While outside the presence of the jury, the State vocalized its intention to rest its case-in-chief. Defense counsel then moved for a directed verdict, which the trial court denied. Defense counsel then indicated, for the first time, his intention to call Gamboe as an expert in gunshot residue—an area of expertise not yet disclosed to the State. Given the argument before the parties regarding Gamboe as an expert witness in gunshot residue, the court released the jury

37

for the day before it allowed defense counsel to make an offer of proof through Gamboe's testimony. Defendant essentially requests this court to ignore the principal reason why notice rules exist, that is, for prevention of surprise to the opposing party. See *Whalen*, 238 Ill. App. 3d at 999. The record supports a finding that defense counsel's late disclosure—after the State expressed its intention to rest—surprised the State. Defense counsel then admitted on the record that he did not disclose Gamboe as an expert in gunshot residue and also that the State's reports concerning Gamboe dealt with firearms, firearm ammunition, and firearm identification, not gunshot residue. After admitting his late disclosure, defense counsel stated that he "didn't think I had to" disclose to the State his intention to call Gamboe as an expert in a different area of expertise. Even absent bad faith, defendant cannot provide a reason for failing to disclose his intention to call Gamboe as a gunshot residue expert. Furthermore, even if the court had limited the scope of Gamboe's testimony, as defendant argues, the State would have been prejudiced by Gamboe's undisclosed testimony and expert qualifications, leaving the State unprepared to rebut Gamboe's testimony with testimony of its own expert witness in gunshot residue.

¶ 98    Next, we note that defendant misstates Sergeant Roberts's testimony, where defendant asserts that Sergeant Roberts "declined" to answer defense counsel's questions. On cross-examination, Sergeant Roberts acknowledged that he was not an expert in the science of gunshot residue but had training to use a machine that tested samples for the presence of gunshot residue. Because he lacked qualification as an expert, Sergeant Roberts did not testify as to the meaning of the negative test result for gunshot residue on Richardson's hands. On cross-examination, however, Sergeant Roberts agreed that the test did not show whether gunshot residue had been "wiped off, affected by the environment, or anything of that nature." He also testified that the machine only detected gunshot residue "at the time" of the test. Sergeant Roberts then confirmed,

38

specific to Richardson's hands, that the test would not show whether Richardson attempted to wipe off any potential residue from his hands.

¶ 99    Although we recognize that the inclusion of Gamboe's testimony was favorable to defendant to show that the absence of gunshot residue on an individual's hands did not necessarily mean the individual did not fire the firearm, we cannot conclude that the result of the proceeding would have been different had the court allowed Gamboe to testify at defendant's trial. Instead, we agree with the State that the defense, through Sergeant Roberts's testimony on cross-examination, highlighted both the limitations of gunshot residue testing and the possibility that Richardson tested negative because he wiped off the residue from his hands or his hands became affected by the environment during and after Richardson fled on foot and hid from police following the shooting. Importantly, as stated above in great detail, the evidence at trial, even absent Sergeant Roberts's testimony concerning Richardson's negative test result for gunshot residue, sufficiently proved defendant guilty beyond a reasonable doubt of first degree murder and armed robbery based on the theory of accountability. We, thus, cannot conclude that the trial court abused its discretion by excluding the defense from calling Gamboe as an expert in gunshot residue.

¶ 100    Lastly, defendant argues that the trial court's "error in barring Gamboe's testimony was not harmless." Having determined that the trial court did not err by barring Gamboe's testimony as an undisclosed expert witness, we need not address defendant's argument. We note, however, that defendant did not provide this court with citation to authority, as required by Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013). The failure to cite any authority or to articulate an argument will result in forfeiture of that argument on appeal. *People v. Olsson*, 2014 IL App (2d) 131217, ¶ 16. We caution counsel in future submissions to comply with Rule 341 to avoid the risk of forfeiture.

¶ 101                              III. Conclusion

¶ 102   For the reasons stated, we affirm defendant's conviction and sentence on the offenses of

first degree murder and armed robbery.


¶ 103   Affirmed.